**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| CYNTHIA MADEJ, et al., | : | |
| Plaintiffs, | : | Case No.: 2:16-cv-00658 |
| v. | : | Chief Judge Sargus |
| ATHENS COUNTY ENGINEER, | : | Magistrate Judge Vascura |
| Defendants. | : | |

**MOTION IN LIMINE OF DEFENDANT ATHENS COUNTY ENGINEER TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT PHYSICIAN DR. JOHN MOLOT**

Now comes Defendant Athens County Engineer ("the Engineer"), who hereby moves this Court for an *order in limine* excluding the opinion testimony of Plaintiffs' expert physician, Dr. John Molot, for the following reasons:

1. MCS cannot be tested as a medical diagnosis;

2. Diagnoses of MCS have not been subject to peer review and publication;

3. There are no standards controlling MCS or Dr. Molot's diagnosis of Ms. Madej; and

4. The tests applied by Dr. Molot do not enjoy widespread acceptance in the scientific community.

The reasons in support of this motion are set forth more fully in the Memorandum In Support which is attached hereto and incorporated herein.

/s/ *Molly Rose Gwin*
Mark Landes        (0027227)
Maribeth Meluch    (0055903)
Molly Gwin         (0088189)
Isaac, Wiles, Burkholder & Teetor, LLC
Two Miranova Place, Suite 700
Columbus, Ohio 43215
P: 614.221.2121
F: 614.365.9516
*Attorneys for Defendant Athens County Engineer Jeff Maiden*

1

## MEMORANDUM IN SUPPORT

**I.  FACTS**

This case arises out of Ms. Madej's belief that she suffers from "chemical sensitivity, also known as environmental illness, which renders many substances used in road paving highly toxic to her."  (ECF No. 16, Page ID # 133.)  Such condition has been commonly referred to by Ms. Madej and her various healthcare providers, both during and before this litigation, as Multiple Chemical Sensitivity ("MCS").  As a result of the aforementioned condition, Ms. Madej seeks an injunction prohibiting the Athens County Engineer from applying chip seal to Dutch Creek Rd. (which is already paved with chip seal) and from applying "any road surfacing or dust-control treatments to Dutch Creek Road that would harm Ms. Madej, including but not limited to chip and seal *[sic]*, asphalt, or any other petrochemical-based road surfacing or dust-control products."  (Id. at Page ID # 139.)

Ms. Madej retained the services of an expert physician, Dr. John Molot.  Dr. Molot's opinions in this matter are based on his review of the following: 1) affidavit provided by Dr. Barbara Singer, dated September 15, 2015; 2) letter of necessity from Dr. Barbara Singer, undated (? *[sic]* September 15, 2015); 3) clinical notes and records of Dr. Barbara Singer; 4) clinical notes and records of Dr. Larry Everhart; 5) letter from Howard Levin (cardiologist), dated October 8, 2009; 6) letter of necessity from Dr. Allan Lieberman, dated September 10, 2015; 7) letter of necessity from Allan Lieberman dated June 29, 2010; 8) clinical notes and records from Dr. Allan Lieberman November 19, 1999-October 4, 2016; 9)[1] asphalt and non-asphalt road products, including MSDS for Chip and Seal, supplied by Cindi Madej; and a two

---

[1] While Dr. Molot mentions these items in his report, he testified in his deposition that he did not rely on those records in forming his opinion because he could not read the writing contained therein. (ECF No. 95 at Page ID # 3378.)

hour assessment performed on May 13, 2017. (Id. at Page ID # 3456.) It is undisputed that Dr. Molot did not expose Ms. Madej to chip seal to test her claimed sensitivity. (Id. at Page ID # 3341.)

## II. LAW AND ANALYSIS

### A. The *Daubert* standard as applied to cases involving chemical exposure.

All expert witness testimony must adhere to the standards put forth in Rule 702 of the Federal Rules of evidence and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993). Fed. R. of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise, if (a) the expert's scientific, technical or other specific knowledge will help the trier of fact to understand the evidence to determine a fact or issue, (b) the testimony is based upon sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied the principles and methods reliably to the facts of the case.

This rule reflects the U.S. Supreme Court's decisions in *Daubert* and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999). *See Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007). It is the proponent of the testimony that must establish its admissibility by a preponderance of proof. See *Daubert*, 509 U.S. at 592 n.10. The Sixth Circuit has applied the *Daubert* standard to cases involving alleged environmental illness and multiple chemical sensitivity to exclude tests performed by various providers. In *Gass v. Marriott Hotel Servs.*, 558 F.3d 419, 426-428 (2009) the Sixth Circuit affirmed the district court's determination to allow the treating physicians to testify regarding symptoms, tests, diagnosis and treatment, but to exclude treating physicians testimony regarding causation, specifically, where and when plaintiffs were exposed to pesticides. *Gass* involved an alleged exposure to pesticides by the

3

Plaintiff during a trip to Marriott hotels, and subsequent treatment by the plaintiff with a physician who specializes in environmental medicine, Dr. Natzke. *Id.* at 423. Dr. Natzke concluded based on one in person appointment with Gass and her traveling companion, DeJonge, and concluded that Gass was "exposed to neurotoxins" and that "all pesticides contain neurotoxins." *Id.* at 424. Based solely on this meeting, Natzke diagnosed both women with "acute pesticide exposures." *Id.* In deciding to exclude these opinions, the Court noted "[b]ecause Dr. Natzke and Dr. DeJonge have not based their causation opinions on any testing data, and the only blood tests which Dr. Natzke relied on did not reveal any detectable levels for the products the lab tested." *Id.* at 426.

Specifically, in cases involving an exposure to toxic substances, the plaintiff "must establish both general and specific causation through proof that the toxic substance is capable of causing, and did cause, the plaintiff's alleged injury. " *Pluck v. BP Oil Pipeline Co*., 640 F.3d 671, 677 (2011). To prove specific causation, "[t]he plaintiff must show that [s]he was exposed to the toxic substance and that the level of exposure was sufficient to induce the complained-of medical condition (commonly called a 'dose-response relationship')." *Id.* at 677 citing *Valentine v. PPG Indus., Inc*., 158 Ohio App. 3d 615, 2004 Ohio 4521, 821 N.E.2d 580, 588 n.1 (Ohio Ct. App. 2004). Because causation inquiries involve scientific assessments, causation must be established through the testimony of a medical expert. *Id.* citing *Baker v. Chevron USA, Inc.*, 680 F. Supp. 2d 865, 874 (S.D. W.D. Ohio 2010) aff'd 533 F. App'x 509 (6th Cir. 2013) "Without this testimony, a plaintiff's toxic tort claim will fail." *Id.*

When specific causation of an injury is at issue, the Sixth Circuit requires that the expert conduct a "differential diagnosis" in order to prove such causation. *Best v. Lowe's Home Ctrs., Inc*., 563 F.3d 171, 179 (2009). See also *Pluck*, 640 F.3d at 678, *Tamraz* v. Lincoln Elec. Co., 620

4

F.3d 665, 674 (6th Cir. 2020), and *Baker, 680* F. Supp. at 521. The failure to undergo this analysis is fatal to a claim of injury resulting from exposure to a hazardous substance. *Baker* at 521.

Differential diagnosis involves identifying the cause of a medical problem by eliminating the most likely causes until the most probably one is isolated. However, not every opinion reached using the differential diagnosis method will meet the reliability requirement of *Daubert*.. *Best*, 563 F.3d at 179. A medical causation opinion in the form of a doctor's differential diagnosis is reliable and admissible "where the doctor (1) objectively ascertains, to the extent possible, the nature of a patient's injury *** (2) 'rules in' one or more causes of the injury using a valid methodology, and (3) engages in 'standard diagnostic techniques by which doctors normally rule out alternative causes' to reach a conclusion as to which cause is most likely." *Id.* at 179. For example, where a medical witness cannot ascertain with any reliable information what component of a chemical product that might have caused injury or point to any objective source suggesting that similar injury might result from exposure to the product, the *Daubert* standard has not been met. See *Downs v. Perstorp Components, Inc*., 126 F. Supp. 2d 1090 (E.D. Tenn. 1999). Further, the failure to perform the third function of ruling out other factors or causes renders any diagnosis deficient. "[T]he mere existence of a toxin in the environment is insufficient to establish causation without proof that the level of exposure could cause the plaintiffs' symptoms." *Pluck, 640 F.3d* at 679.

In *Daubert*, the Supreme Court provided a non-exhaustive list of factors which may, in any given case, bear on a trial judge's gatekeeping determination. These factors may include: (1) whether a "theory or technique . . . can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) whether, with respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and (4) whether the theory or technique enjoys "general

5

acceptance" within a "relevant scientific community." 509 U.S. at 592-94. Such approach has been adopted by the Sixth Circuit. See *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir.2007). Here, all testimony by Dr. John Molot fails to meet these factors, and must be stricken.

### B. Dr. Molot's opinion testimony does not meet Rule 702 or *Daubert* standards.

#### 1. MCS cannot be tested as a medical diagnosis.

Scientific method "'is based on generating hypotheses and testing them to see if they can be falsified.'" *Daubert,* 509 U.S. 125, 483 (citation omitted). "If the experts cannot tie their assessment of data to known scientific conclusions, based on research or studies, then there is no comparison for the [fact-finder] to evaluate." *Porter v. Whitehall Laboratories, Inc.*, 791 F. Supp. 1335 (S.D. Ind. 1992) *aff'd* 9 F.3d 607 (7th Cir. 1993). Dr. Molot admits there are no biological markers for MCS, and the only hallmarks are through subjective reports from the patient. (ECF 95-1, Page ID 3467). Dr. Molot describes the diagnostic procedure for MCS as, "[t]he diagnosis is established when other disorders are ruled out and the history is compatible with the case criteria." (Id.). Because of the subjective nature of such a diagnosis, federal courts routinely decline to admit evidence regarding MCS under *Daubert* finding that it is not a medically recognized diagnostic condition. See e.g., *Snyman v. W.A. Baum Co., Inc.*, No. 04 Civ. 2709, 2008 U.S. Dist. LEXIS 103266 (S.D.N.Y. 2008)("Courts have consistently rejected MCS claims for failing to meet the Daubert standard"); *Gabbard v. Linn-Benton Hous. Auth.*, 219 F. Supp. 2d 1130, 1134 (Ore. 2002)(Court granted motion *in liming* to exclude expert testimony on MCS because "[t]o the court's knowledge no district court has ever found a diagnosis of [MCS] to be sufficiently reliable to pass muster under *Daubert*"); *Coffin v. Orkin Exterminating Co.*, 20 F. Supp. 2d 107 (Me. 1998)(Court excluded all evidence related to MCS as "every federal court that

6

has addressed the issue of admissibility of expert witness testimony on MCS under *Daubert* has found such testimony too speculative to meet the requirement of 'scientific knowledge'); *Summers v. Missouri* Pac. R.R. Sys., 897 F. Supp. 533, 542 (E.D. Okl. 1995) aff'd 132 F.3d 599 (10th Cir. 1997)(Plaintiffs failed to show that the theories relating to the causes of MCS had been adequately tested); *Frank v. New York*, 972 F. Supp. 130, 136-7 (1997)(Granting motion *in limine* as the theory underlying MCS is "untested, speculative and far from the general acceptance in the medical or toxicology community."); *Bradley v. Brown*, 852 F. Supp. 690, 698-99 (N.D. Ind.) aff'd 42 F.3d 434 (7th Cir. 1994)(finding "the science of MCS's etiology has not progressed from the plausible, that is, the hypothetical, to knowledge capable of assisting the fact-finder, jury or judge"); *Sanderson v. Int'l Flavors & Fragrances*, 950 F. Supp. 981, fn. 2 (C.D. Cal. 1996)(declining to admit any testimony regarding MCS because there is no scientific evidence that it exists as a physiological illness.)

### 2. Dr. Molot's opinion is not based on sound methodology and does not establish specific causation.

Dr. Molot testified there is no formal system in place where MCS can be diagnosed or the criteria for it can be met for recognition. (ECF. No. 95 at Page ID # 3349.) In keeping with this standard, the tests that Dr. Molot performed were limited to a very basic physical examination, and did not include testing regarding substances to which Ms. Madej claims sensitivity. (Id.). Dr. Molot's report indicated that he took Ms. Madej's blood pressure, examined her pulse, her vital signs, examined her skin, conducted a pupil evaluation, examined her nears, nose and throat, listened to her chest, and her heart. (ECF No.95-1 at Page ID # 3461.) Other than noting a 16/18 tender points positive for fibromyalgia, Dr. Molot noted nothing abnormal in Ms. Madej. (Id). Notably, Dr. Molot examined Ms. Madej outside on a neighbor's property, ergo not controlling of any of the alleged antigens, including pesticides, that Ms. Madej claims she is sensitive to. (Id.)

7

Finally, when Dr. Molot was questioned as to whether he reviewed the test results from Lieberman, he indicated that "he had a hard time understanding what was written when the results were recorded." (Id. at Page ID # 3378.)

As this Court is aware, one of Ms. Madej's claims is that she suffers from dizziness, nausea, and shortness of breath. Notably, Dr. Molot rejected widely accepted tests that are available to evaluate the symptoms, indicating that a methacholine test would not show whether she was actually short of breath (Id. at Page ID # 3408) and that an EKG would not show cardiac damage. (Id. at Page ID # 3409.) Numerous federal courts have excluded testimony regarding MCS wherein it is not supported by tests to rule out other causes. See *Summers v. MO Pac. R.R. Sys.*, 132 F.3d 599, 604 (10th Cir. 1997) (holding testimony properly excluded where no scratch testing, patch test, or RAST test for IG antibodies performed.). See also, *Williams v. Mosaic Fertilizer, LLC*, 11th Cir. No. 17-10894, 2018 U.S. App. LEXIS 12478, at *11 (May 14, 2018) (finding that where no analysis of dose response, defined as "the hallmark of basic toxicology" was provided, such information was not sufficiently reliable and experts opinions were properly excluded). It is especially important here where Ms. Madej claims she is sensitive to more chemicals than she is not, including vehicle exhaust[2], that these confounding factors be ruled out as would be done in a proper differential diagnosis. Dr. Molot did nothing of the sort. As Dr. Molot's opinions are not based on any tests, other than a two hour examination, his opinions must be stricken as he has not proven specific causation. *Baker,* 680 F. Supp.2d at 874.

### 3. Diagnoses of MCS have not been subject to peer review and publication.

Peer review is significant under *Daubert* because "scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in

---

[2] Ms. Madej complained to Dr. Singer that her three primary offenders were pesticides, herbicides and vehicle exhaust, all of which exist now on Dutch Creek Road. (ECF No. 81 at Page ID # 1734.)

methodology will be detected." 509 U.S. at 483. See *Bradley v. Brown*, 852 F.Supp.690, 699 (N.D. Ind. 1994) (finding that science on MCS has not progressed from the plausible to knowledge capable of assisting the trier of fact." Dr. Jones describes himself as "an advocate for awareness of environmental exposures." (ECF No. 95 at Page ID # 3347.) While Dr. Jones has written a book entitled "12,000 Canaries Can't Be Wrong" which he describes as including "…a calculation of the number of patients that I have seen with likely one or more of these three [MCS, Chronic Fatigue Syndrome, or Fibromyalgia] since I began my practice in this area." (ECF No. 95 at Page ID # 3294.) Dr. Molot could not recall the name of any published scientific papers regarding potential health effects of multiple indoor contaminates such as volatile organic compounds. (Id. at 3336.) When questioned as to the published scientific papers regarding potential adverse health effects of multiple indoor contaminates, Dr. Molot indicated that he could not identify with specificity any items that applied directly to Ms. Madej. (Id. at Page ID # 3339.) See *Williams*, 2018 U.S. App., Lexis 12478, at 17 (finding that where expert failed to identify studies, his testimony was properly excluded). Dr. Molot describes himself as an "advocate for greater understanding of that condition for more research with respect to the condition and for educating physicians as to how to manage the condition in the best way in the patient's best interest." (Id.). Because MCS has not been accepted by any federal courts, nor has it been considered a scientific discipline, opinions regarding it are not sufficiently reliable and his testimony must be stricken.

### 4. There are no standards controlling MCS or Dr. Molot's diagnosis of Ms. Madej.

It is undisputed that Dr. Molot, rather than reaching independent conclusions, based his findings in his report on questions posed by the Madejs' former counsel. (ECF No. 95-1 at Page ID # 3456.) *See Early v. Toyota*, 277 F.App'x 581, 585 (6th Cir. 2008)(finding that where no

9

independent testing was done, and proffered expert opined only as to general information referenced in various handbooks, such testimony was not that of an expert.). The only tests Dr. Molot administered to Ms. Madej were a blood pressure test, a measurement of vital signs, a pupil assessment, and abdominal examination. (ECF 95-1 at Page ID # 3451.) Dr. Molot performed no tests on Ms. Madej for any of the substances she claims reactivity to, and he tested her outside on her neighbor's property. (Id). Finally, Dr. Molot indicated that he could not identify any medical basis for the one mile restriction:

> Q. Okay. Do you think there's any medical basis for the need for an injunction within a mile of her home?
>
> A. The question that I can't answer you exactly is how far away from that road she would need to be. I can't answer that.
>
> Q. Okay. Why not?
>
> A. Because nobody knows. We know, for example, when we look generally at proximity to major roadways and impacts on biological function let alone health. So studies arbitrarily pick a line, 200 meters, kilometer, which .6 of a mile. And compare people who are on one side of that line versus people on the other side of the line to see if there's a difference.

(ECF No. 95 at Page ID # 3355.) Doctor Molot's evaluation of this patient was limited to a cursory, two hour review. Further, by Dr. Molot's own admission, he has no evidence that there is any correlation between the timing of the chip seal on the road and Ms. Madej's claimed MCS. Dr. Molot testified as follows:

> Q. …There's been testimony in this case from Ms. Madej as well as from Dr. Lieberman, her treating physician, that she's still very, very ill. She's still sick despite the injunction prohibiting the use of chip and seal. Do you have any reason to dispute that?
>
> A. No.
>
> Q. Okay. So could it be the chip and seal that's making her ill if there's been an injunction prohibiting it, but she's still sick?

> A. No. She was sick before they were any paving going on in the road altogether as far as I understand. She's been sick for 30 years. And I know there was a period of time when she became more ill or lost weight, for some reasons. I was not the clinician at that time. But she's been generally very unwell for a very long time. She's been seeing Dr. Lieberman for, I don't know, 20 years, whatever it's been. This woman is chronically ill, ***And I don't think that - - I do not believe and I have not been led to believe that there's been a correlation with how much more sick she may or may not be in coordination with the timing of when the chip and seal was applied on the road in question.***

(Id. at Page ID # 3358.) (emphasis added). Dr. Molot admitted that if you asked him "which chemicals in particular she's reacting to in a scented product or chip seal, for example, nobody knows." (Id. at Page ID # 3380.) Dr. Molot further testified that Ms. Madej too does not know what these chemicals are. (Id. at Page ID # 3381.) Based on this testimony, Dr. Molot has no evidence regarding the effect of chip seal on Ms. Madej. As there are no standards controlling his assessment, or any opinion rendered that would assist the trier of fact as required by Fed. R. 702, his testimony must be excluded.

### 5. The tests applied by Dr. Molot do not enjoy widespread acceptance in the scientific community.

As set forth above, such methods do not enjoy widespread acceptance in the scientific community, and the lack of recognition has been well established by federal Courts. See *Gass v. Marriott Hotel Servs.*, 558 F.3d 419, 426-428 (2009) (holding exclusion of expert's opinion as to causation was proper). Moreover, the International Classification of Diseases and the American Medical Association do not recognize MCS as a disability. (ECF No. 95 at Page ID # 3289.) As these opinions do not enjoy widespread treatment, they should be stricken. For these reasons, Molot's testimony must be stricken.

### III. CONCLUSION

For the above reasons, the Engineer seeks an order *in limine* prohibiting the introduction into evidence of the medical opinions by Dr. Molot.

11

Respectfully submitted,

/s/ *Molly Rose Gwin*
Mark Landes     (0027227)
mlandes@isaacwiles.com
Maribeth Meluch   (0055903)
mmeluch@isaacwiles.com
Molly Gwin      (0088189)
mgwin@isaacwiles.com
Isaac, Wiles, Burkholder & Teetor, LLC
Two Miranova Place, Suite 700
Columbus, Ohio 43215
P: 614.221.2121
F: 614.365.9516
*Attorneys for Defendant Athens County Engineer Jeff Maiden*

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2018 a copy of the foregoing *Motion in Limine* was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *Molly R. Gwin*
Molly R. Gwin (0088189)