**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| CYNTHIA MADEJ, et al., | : | |
| Plaintiffs, | : | Case No.: 2:16-cv-00658 |
| v. | : | Chief Judge Sargus |
| ATHENS COUNTY ENGINEER, | : | Magistrate Judge Vascura |
| Defendants. | : | |

**MOTION IN LIMINE OF DEFENDANT ATHENS COUNTY ENGINEER TO EXCLUDE TESTIMONY OF PLAINTIFFS' TREATING PHYSICIANS DR. BARBARA SINGER AND DR. ALLAN LIEBERMAN**

Now comes Defendant Athens County Engineer ("the Engineer") who hereby moves this Court for an *order in limine* excluding the opinion testimony of Plaintiffs' treating physicians; specifically, Dr. Barbara Singer ("Singer") and Dr. Allan Lieberman ("Lieberman") (collectively "the treating physicians"). The treating physicians are fact witnesses and may not render opinion testimony. Moreover, the opinions of the treating physicians are not based on sound methodology, are speculative, and are not reliable. They therefore cannot assist the trier of fact and do not meet the requirements of Federal Rule of Evidence 702.

The reasons in support of this motion are set forth more fully in the Memorandum In Support attached hereto and incorporated herein.

1

/s/ *Molly R. Gwin*
Mark Landes        (0027227)
mlandes@isaacwiles.com
Maribeth Meluch   (0055903)
mmeluch@isaacwiles.com
Molly Gwin          (0088189)
mgwin@isaacwiles.com
Isaac, Wiles, Burkholder & Teetor, LLC
Two Miranova Place, Suite 700
Columbus, Ohio 43215
P: 614.221.2121
F: 614.365.9516
*Attorneys for Defendant Athens County Engineer Jeff Maiden*

## MEMORANDUM

### I.    FACTS

This case arises out of Mrs. Madej's belief that she suffers from "chemical sensitivity, also known as environmental illness, which renders many substances used in road paving highly toxic to her."  (ECF No. 16 at Page ID # 133.)  Such condition has been commonly referred to by Mrs. Madej and her various healthcare providers, both during and before this litigation, as Multiple Chemical Sensitivity ("MCS").  As a result of the aforementioned condition, Mrs. Madej seeks an injunction prohibiting the Athens County Engineer from applying chip seal to Dutch Creek Rd. (which is already paved with chip seal) or from applying "any road surfacing or dust-control treatments to Dutch Creek Road that would harm Mrs. Madej, including but not limited to chip and seal *[sic],* asphalt, or any other petrochemical-based road surfacing or dust-control products."  (Id. at Page ID # 139.)

Besides those of herself and her husband, Mrs. Madej primarily bases her belief about the harm she will sustain, if chip seal is used, on opinions rendered by the treating physicians. (ECF 76 at Page ID #770).   The Engineer will address each of the treating physicians' involvement in turn.

### A.  Mrs. Madej's treatment with Singer.

Mrs. Madej began treating with Singer in 2011. (ECF No. 81 at Page ID # 1640.)  Singer is a board certified primary care physician who holds a doctorate of Osteopathic Medicine. (Id. at Page ID # 1631.)  Prior to removal of this case, the Athens County Common Pleas Court issued an injunction requiring "that no chip and seal paving occur on Dutch Creek Road within a one mile radius of plaintiff's house until further order of this Court."  (ECF No. 16 at Page ID # 152.) In granting this injunction, the Common Pleas Court relied in part on medical evidence presented

in person by Singer. (ECF No. 16 at Page ID # 147)(ECF No. 81 at Page ID # 1845).  However, by Singer's own admission, MCS is not her specialty and she is not an expert in MSC. (Id. at Page ID # 1760.) Singer admits that MCS is not even a recognized diagnosis by the ICD 10 (Id. at Page ID # 1792.) Singer bases many of her conclusions regarding Mrs. Madej on a letter that Mrs. Madej brought to her which had been signed by Lieberman.  (Id. at Page ID # 1740; 1760). This letter from Dr. Lieberman identified a myriad of substances that Ms. Madej was allegedly chemically sensitive to, none of which Singer tested her for. Singer testified she would not even know how to test for MCS. (Id. at Page ID # 1664.)   As will be demonstrated below, none of Singer's opinions regarding the use of any substances on the road are based on any objective medical evidence or reliable methodologies.  Her conclusion that a one mile restriction is required she based on the request from the Madejs.  (Id. at Page ID # 1790.)  Her testimony is inadmissible under R. 702 and *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993).

**B.  Mrs. Madej's treatment with Lieberman.**

Lieberman is the sole shareholder of The Center for Occupational and Environmental Medicine, located in North Charleston, South Carolina ("The Center").  (ECF No. 91 at Page ID # 2897.)  He is a board certified physician in environmental medicine, a non-recognized field of medicine by the AMA.  (Id. at Page ID # 2899.)  The only time Mrs. Madej has appeared in person at the Center is on or about November 1999.  (Id. at Page ID # 2980.)  Lieberman could not recall if he had ever met Mrs. Madej in person, and at the time of her initial diagnosis, she was seen by Lieberman's colleague, Dr. Shear.  (Id. at Page ID # 2903.)   With the exception of a brief hiatus in treatment from 2000 to 2006, Lieberman treated Mrs. Madej on approximately a monthly basis via telephone.  (Id. at Page ID # 3000.)  Medical records from Lieberman were

incomplete, based on his testimony that in a switch to a new system, many medical records were lost. (Id. at Page ID #2984.) Despite not treating Mrs. Madej in person since 1999 (if at all), Lieberman opined that she could be subject to life threatening harm if the road is chip sealed. (Id. at Page ID # 2991.) Lieberman's opinions are set forth in three letters, authored between September 2, 2015 and September 10, 2015. The medical records produced reveal that on September 1, 2015, Mrs. Madej contacted Lieberman and the "diagnosis:/plan was indicated as: Needs letter for asphalting." (Id. at Page ID # 3176.) It is undisputed that prior to this time, no mention was made by Mrs. Madej to doctor Lieberman of a sensitivity to asphalt. (Id. at Page ID # 3058.) The letters may be summarized as follows:

1. The September 2, 2015 Letter: The first letter of medical necessity notes that "Cynthia Madej suffers from 'severe chemical sensitivity' and she can be placed in a life threatening situation by even minimal exposures to many common materials and chemicals, particularly those originating from petrochemicals. Examples of the concerning chemicals include: herbicides/fertilizers; pesticides; petroleum products such as tar and blacktop; oil; fuels; exhaust; paints; varnishes and polyurethanes; and smoke combustion bi-products." (Id. at Page ID 3135). Such letter additionally states, "…it is also strongly advised that Cynthia is contacted prior to planning or a minimum of three days before initiating any road construction or maintenance activity within 1 mile of her residence." (Id.)

2. The September 4, 2015 Letter: The second letter of medical necessity, signed two days later, identified the same alleged stressors for Mrs. Madej, however, instead of requiring simply notification, this letter required that activities be totally restricted within a mile from her home. (Id. at Page ID # 3137.) Lieberman testified he had no

idea why this difference existed, and that no new medical evidence was presented. (Id. at Page ID # 2936.)

3. The September 10, 2015 Letter:  The third letter also requested that activities be avoided within one mile.  (Id. Page ID # 3138.) Lieberman testified he believed the reason for writing it was in support of Mrs. Madej's request for an injunction.

Notably, Lieberman opined that he did not diagnose Mrs. Madej with multiple chemical sensitivity because "there is no diagnosis of multiple chemical sensitivity."  (ECF No. 91 at Page ID # 2961.)  Lieberman testified that the only testing conducted on Mrs. Madej was done in 2000 and it involved having Mrs. Madej place a substance Lieberman described as "petroleum derived ethanol" under her tongue.  (Id. at Page ID # 3086.)  Lieberman has not performed any other testing to determine what Mrs. Madej is sensitive to.  Lieberman's testimony may best be summarized as follows:

Q.     Understood.  And we've had a lot of testimony regarding her vulnerability.  Does that have anything to do with the paving of the road, though, from a medical standpoint?

A.     *No.*  But one of the basic principles of environmental medicine is the concept of the total load, and part of that total load certainly would be nutrition, and nutrition was a very big concern for us, as we noticed that her weight -- when I believe I looked was like 125 pounds. · She's 5 foot 7 1/2, if I recall correctly, and so she was sort of thin to begin with. And then she goes all the way down, I think, to maybe 107 or 117. So she's lost quite a bit of weight because she's so restricted in terms of what she's eating, and that was a big danger for her. And I noticed that Dr. Weirs, probably in 2018 or '17, cautions her that she has to try to eat even if she doesn't want to.

Q.     Yes. Absolutely.  And again, her nutrient deficiencies, they are not related at all to the ·substance that the county engineer uses on the road,

A.·    *Yes. That's correct*.

(ECF No. 91 at Page ID # 2939-3940.) (emphasis added).  Lieberman admitted that the one mile restriction posed was arbitrary.  (Id. at Page ID # 2930.)  Like Singer, Lieberman's opinions are

6

not based on any reliable methodology, testing, or objective diagnosis.  For these reasons, his medical testimony may not be considered, or relied upon by Mrs. Madej.

## II.  LAW AND ANALYSIS

### A.  The *Daubert* standard as applied to cases involving chemical exposure.

All expert witness testimony must adhere to the standards put forth in Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993).

Fed. R. of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise, if (a) the expert's scientific, technical or other specific knowledge will help the trier of fact to understand the evidence to determine a fact or issue, (b) the testimony is based upon sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied the principles and methods reliably to the facts of the case.

This rule reflects the Supreme Court's decisions in *Daubert* and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999).  *See Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007).    It is the proponent of the testimony that must establish its admissibility by a preponderance of proof. See *Daubert*, 509 U.S. at 592 n.10.  A treating physician may provide expert testimony regarding a patient's illness, the appropriate diagnosis for that illness, and the cause of the illness. *See Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 870 (6th Cir. 2007).  However, a treating physician's testimony remains subject to the requirement set forth in *Daubert*.  *Id*. citing, *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

The Sixth Circuit has applied the *Daubert* standard to cases involving alleged environmental illness, and multiple chemical sensitivity to exclude tests performed by various providers.  In *Gass v. Marriott Hotel Servs.*, 558 F.3d 419, 426-428 (2009) the Sixth Circuit

affirmed the district court's determination to allow the treating physicians to testify regarding symptoms, tests, diagnosis, and treatment, but to exclude treating physicians testimony regarding causation, specifically, where and when plaintiffs were exposed to pesticides. *Gass* involved an alleged exposure to pesticides by the Plaintiff during a trip to Marriott hotels, and subsequent treatment by the plaintiff with a physician who specializes in environmental medicine, Dr. Natzke. *Id.* at 423. Dr. Natzke concluded based on one in person appointment with Gass and her traveling companion, DeJonge, that Gass was "exposed to neurotoxins" because "all pesticides contain neurotoxins." *Id.* at 424. Based solely on this meeting, Natzke diagnosed both women with "acute pesticide exposures." *Id.* In deciding to exclude these opinions, the Court noted "[b]ecause Dr. Natzke and Dr. DeJonge have not based their causation opinions on any testing data, and the only blood tests which Dr. Natzke relied on did not reveal any detectable levels for the products the lab tested." *Id.* at 426.

The court explained that the ability to diagnose medical conditions is not the same as the ability to opine as an expert about the causes of those medical conditions. *Id.* at 426. *See also In Re Scrap Metal Antitrust Litig.*, 527 F.3d. 517, 529-30 (6th Cir. 2008)("The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation.").

Specifically, in cases involving an exposure to toxic substances, the plaintiff "must establish both general and specific causation through proof that the toxic substance is capable of causing, and did cause, the plaintiff's alleged injury. " *Pluck v. BP Oil Pipeline Co.*, 640 F. 3d 671, 677 (2011). To prove specific causation, "[t]he plaintiff must show that [s]he was exposed to the toxic substance and that the level of exposure was sufficient to induce the complained-of

medical condition (commonly called a 'dose-response relationship')." *Id.* at 677 citing *Valentine v. PPG Indus., Inc.*, 158 Ohio App. 3d 615 (Ohio Ct. App. 2004). Because causation inquiries involve scientific assessments, causation must be established through the testimony of a medical expert. *Id.* citing *Baker v. Chevron USA, Inc.*, 680 F. Supp. 2d 865, 874 (S.D. W.D. Ohio 2010) aff'd 533 F.App'x 509 (6th Cir. 2013) "Without this testimony, a plaintiff's toxic tort claim will fail." *Id.*

When specific causation of an injury is at issue, the Sixth Circuit requires that the expert conduct a "differential diagnosis" in order to prove such causation. *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 179 (6th Cir. 2009). See also *Pluck* 640 F.3d 671 at 678; *Tamraz v. Lincoln Electric*, 620 F.3d 665, 674 (6th Cir. 2010); *Baker, 533 F.App'x* at 521. The failure to undergo this analysis is fatal to a claim of injury resulting from exposure to a hazardous substance. *Best*, 563 F.3d at 179.

Differential diagnosis involves identifying the cause of a medical problem by eliminating the most likely causes until the most probable one is isolated. However, not every opinion reached using the differential diagnosis method will meet the reliability requirement of *Daubert*. *Best*, 563 F.3d at 179. A medical causation opinion in the form of a doctor's differential diagnosis is reliable and admissible "where the doctor (1) objectively ascertains, to the extent possible, the nature of a patient's injury *** (2) 'rules in' one or more causes of the injury using a valid methodology, and (3) engages in 'standard diagnostic techniques by which doctors normally rule out alternative causes' to reach a conclusion as to which cause is most likely." *Id.* at 179. For example, where a medical witness cannot ascertain with any reliable information what component of a chemical product that might have caused injury or point to any objective source suggesting that similar injury might result from exposure to the product, the *Daubert* standard has not been met. See

*Downs v. Perstorp Components, Inc*., 126 F. Supp. 2d 1090 (E.D. Tenn. 1999).  Further, the failure to perform the third function of ruling out other factors or causes renders any diagnosis deficient. "[T]he mere existence of a toxin in the environment is insufficient to establish causation without proof that the level of exposure could cause the plaintiffs' symptoms." *Pluck*, 640 F. 3d. at 679.

**B.  Singer and Lieberman are fact witnesses and may not render opinions in this case.**

Fed. R. Civ. P. 26(a)(2)(A) provides:

…a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.  Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report-prepared and signed by the witness-if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony.  The report must contain….

Singer and Lieberman did not provide reports containing any of their expert opinions.  All of their respective opinions are based on their treatment of Ms. Madej.  See *Fisher v. Ford Motor Co.*, 178 F.R.D. 195, 197 (N.D.Ohio 1998) (citing favorably *Sipes v. United States*, 111 F.R.D. 59 (S.D. Cal. 1986) (treating physician not an expert where information and opinions were obtained through care and treatment of plaintiff)). Moreover, by Dr. Lieberman's own admission, his testimony is offered as a treating physician for the Plaintiff.  (ECF No. 91 at Page ID # 3103.)  As fact witnesses, Singer and Lieberman may not opine as experts, and may not render any opinions regarding Ms. Madej.  Moreover, for all of the reasons stated below, the treatment and resulting testimony by Singer and Lieberman does not satisfy the standard of *Daubert* and therefore Singer and Lieberman do not qualify as experts.

**C.  Any testimony, regardless of whether it is offered by Singer or Lieberman regarding MCS, is inadmissible because the Sixth Circuit does not recognize MCS as a medical disability.**

Federal courts routinely decline to admit evidence regarding MCS under *Daubert* based upon a finding that it is not a medically recognized diagnostic condition. See *Snyman v. W.A. Baum Co., Inc.*, No. 04 Civ. 2709 (LTS)(DFE) 2008 U.S. Dist. LEXIS 103266, at *3 (S.D.N.Y. Dec. 22, 2008) *aff'd* 360 F. App'x 251 (2d Cir. 2010) ("Courts have consistently rejected MCS claims for failing to meet the *Daubert* standard"); *Gabbard v. Linn-Benton Hous. Auth.*, 219 F. Supp. 2d 1130, 1134 (Ore. 2002) (Court granted motion *in liming* to exclude expert testimony on MCS because "[t]o the court's knowledge, no district court has ever found a diagnosis of [MCS] to be sufficiently reliable to pass muster under *Daubert*"); *Coffin v. Orkin Exterminating Co.*, 20 F. Supp. 2d 107, 110 (Me. 1998) (Court excluded all evidence related to MCS as "every federal court that has addressed the issue of admissibility of expert witness testimony on MCS under *Daubert* has found such testimony too speculative to meet the requirement of 'scientific knowledge'"); *Summers v. Missouri Pac. R.R. Sys.*, 897 F. Supp. 533, 542 (E.D. Okl. 1995), aff'd, 132 F.3d 599 (10th Cir. 1997) (Plaintiffs failed to show that the theories relating to the causes of MCS had been adequately tested); *Frank v. New York*, 972 F. Supp. 130, 136-37 (N.D.N.Y.1997) (Granting motion *in limine* as the theory underlying MCS is "untested, speculative and far from the general acceptance in the medical or toxicology community."); *Bradley v. Brown*, 852 F. Supp. 690, 698-99 (N.D. Ind.) *aff'd* 42 F.3d 434 (7th Cir. 1994) (finding "the science of MCS's etiology has not progressed from the plausible, that is, the hypothetical, to knowledge capable of assisting the fact-finder, jury or judge"); *Sanderson v. Int'l Flavors & Fragrances*, 950 F. Supp. 981, 1002 (C.D. Cal. 1996) (declining to admit any testimony regarding MCS because there is no scientific evidence that it exists as a physiological illness).

Although some Ohio courts have allowed evidence of MCS (although they generally regard it as an allergy) for purposes of determining BWC eligibility, intentional torts, State

Teachers Retirement System eligibility, disability discrimination and home construction, it is seldom found determinative. See *Googash v. Conrad*, 2004-Ohio-5796 (Ct. App.) (BWC claim allowed for MCS and other maladies, MCS not distinguished); *Ogilbee v. Bd. of Edn. of Dayton Pub. Schs*, 2d Dist. Montgomery No. 23432, 2010-Ohio-1913 (Failed to establish MCS was a disability); *State ex rel. Pipoly v. State Teachers Ret. Sys.*, 2002-Ohio-2219, 95 Ohio St. 3d 327, (MCS not a basis for disability retirement); *Murray v. E. Ohio Gas Co*., 110 Ohio App. 3d 57 (1996) (remanded and allowed for purposes of determining whether there was an intentional tort); *Temple v. Fence One, Inc.*, 8th Dist. Cuyahoga No. 85703, 2005-Ohio-6628 (fence company not liable for plaintiff's MCS for installing fence two doors down). No Ohio court appears to have faced a defensive challenge to the admissibility of MCS.

Because MCS is not a recognized medical condition or disease by any national medical authority, such as the AMA or the ICD-10, these opinions do not rest on sound scientific grounds and cannot be validated with any accepted methodology. It cannot be credibly suggested that the diagnosis made by these medical experts has been tested, peer reviewed or generally accepted by the medical community when no established medical association recognizes it as a legitimate medical condition. Therefore their opinions are inadmissible under *Daubert* and Rule 702.

**D. Singer's testimony does not meet the *Daubert* standard because she failed to conduct differential diagnosis tests on the Plaintiff and relied primarily on a letter from Lieberman.**

Singer opined "Cynthia Madej is a patient that suffers from severe chemical sensitivity resulting from toxic exposure. She presents with a wide array of symptoms caused by organ and neurological damage and has limitations that require non-standard level of care and special considerations in handling and treatment." (ECF No. 16 at Page ID # 140.) Singer identified a variety of chemicals that Mrs. Madej must limit her exposure to, specifically: diesel, jet and other

fuels, exhaust, tar and asphalt, oil, herbicides and pesticides, smoke.  (Id.)  According to Singer's testimony, hospitalization is not a viable option, because the plastics and chemicals used at hospitals would exacerbate Mrs. Madej's illness."  (Id. at Page ID # 146.)  Finally, she testified via Affidavit:

> If Cynthia's road has a chip and seal or asphalt surface (or other surfacing that contains volatile organic compounds or toxins to which she is sensitivity) especially while she is already in a weakened state from her anemia condition, weight loss, and cardiometabolic decompensation, it is my opinion to a reasonable degree of medical certainty that she will suffer serious physical harm or possibly death.

(Id. at Page ID # 141; ECF No. 81 at Page ID # 1845).  Singer indicated that she believed that the opinions in her Affidavit were requested via "either the Madejs or their lawyer."  (ECF No. 81 at Page ID # 1732.)  She indicated that she was "asked to write an affidavit about the situation and how it could impact her lawsuit." (Id. at Page ID # 1733.)  It is undisputed that Singer ***never*** tested Mrs. Madej for any of the substances Singer identified above could be harmful to her. (ECF No. 81 at Page ID # 1682.)  In addition, when Mrs. Madej visited Singer she never made mention of the road in front of her home, nor could Singer recall Mrs. Madej ever indicating to her any sensitivity to asphalt or chip seal.  (Id. at Page ID # 1734.)  Singer indicated that the primary offenders for Ms. Madej's sensitivity are herbicides and pesticides, and exhaust, all of which are still present regardless of the injunction. (Id. at Page ID # 1735.)

Moreover, by Singer's own admission she is not an expert in chemical sensitivity or environmental illness, but relied solely on a letter Mrs. Madej presented to her at her first visit, authored by Lieberman.  (Id.)  Singer did, in fact, diagnose Mrs. Madej with a serious health condition, specifically noting that she was anemic.  (Id. at Page ID # 1690.)  She urged Mrs. Madej to see a gastrointestinal specialist, based on her belief that Mrs. Madej may have a possible

gastrointestinal bleed, but Mrs. Madej declined to do so, citing concerns about leaving her home.

(Id. at Page ID # 1784.)    Singer's testimony regarding her medical evidence was as follows:

> Q.      Okay.  And then you've noted a potential for heart attack for Cynthia, as a result of exposure to these chemicals correct?  In Paragraph 4?
>
> A.      Right.  Well she was having peripheral edema, which is associated with congestive heart failure.  That's what we get with low protein states.  So I was concerned about heart failure.
>
> Q.      But that was based on her low protein state, correct?
>
> A.      Yea.
>
> Q.      It was not based on exposure to these chemicals, correct?
>
> A       That it could make that worse, correct.  But she was already vulnerable.  So I mean I was definitely looking at a patient who I felt was vulnerable and hoping for her sake that she didn't have any exposure.
>
> Q.      But what evidence do you have that exposure to any of these items created vulnerability for her?
>
> A.      I guess that is in her report and the report from Dr. Lieberman.
>
> Q.      I mean, again, you have objective medical evidence that there are other factors that are contributing to her vulnerability, the anemia, the poor diet, the lack of protein.
>
> A.      Correct.
>
> Q.      You don't have any medical evidence that any of these compounds are creating a fragile state for her.
>
> A.      Dr. Lieberman did indeed state that she had this condition, and it is his expertise.

(ECF No. 81 at Page ID # 1747-1749.)  Reliance on the opinion of another physician (in order to opine that there is a life threatening situation for a patient) clearly does not meet the rigors of a *Daubert* analysis.   *Taylor v. B. Heller and Co.*, 364 F.2d 608, 613 (6th Cir. 1966) ("[E]xpert opinion may not be based upon the opinion of others, either in evidence or not in evidence.").

See also, *Mike's Train House v. Lionel, L.L.C.,* 364 F.2d 608, 407-408, (6th Cir. 2006) (holding testimony of expert relying upon report of other expert, even where independently corroborated was not sufficient indicia of reliability and expert's testimony was properly excluded). See also, *American Key Corp. v. Cole National Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985) ("[E]xpert opinions ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or not.").

Singer failed to perform any medical tests, obtain any independent medical evidence, and relies totally on the testimony of Lieberman. Her testimony is not reliable under Fed R. of Evid. 702 and *Daubert*, and therefore must be excluded.

### E. Fed. R. Evid. 702 and *Daubert* preclude Lieberman from testifying about Mrs. Madej's medical condition or the cause of her alleged present and future symptoms upon exposure to asphalt or chip seal being used to pave Dutch Creek Road.

Like Singer, Lieberman's medical opinions fail to meet the requirements of *Daubert* and R. 702. "In order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation--i.e., "good grounds," based on what is known." *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 250 (6th Cir. 2001). In *Nelson*, the court declined to allow the Plaintiffs' expert to render opinions wherein he failed to address confounding factors that could also have caused Plaintiff's symptoms and could not factually show actual exposure. *Id*. at 253-254. Moreover, the Sixth Circuit has recognized that a differential diagnosis as an appropriate method for making a determination of causation for an individual for a disease. See *Best,* 563 F.3d at 178 (describing a differential diagnosis as "[t]he method by which a physician determines what disease process caused a patient's symptoms. The physician considers all relevant potential causes of the

symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history.").

In this case, Lieberman has employed no methodology at all in evaluating Mrs. Madej. He testified that the only substance he tested her for (to which Mrs. Madej still claims sensitivity) is a "petroleum derived ethanol." (ECF No. 91 at Page ID # 3086.)  This test was administered on or about December 2, 1999.  (Id. at Page ID # 3207.)  Lieberman freely admitted that these test results could have changed over the 19 year period. (Id. at Page ID # 2954.)  He tested her by placing the antigen on a piece of paper that goes under her tongue.  (Id.)  As the testimony of Dr. Robert Baratz establishes, such method is unreliable to diagnose an allergy. Lieberman could not identify the amount, only stating "…it's an extremely small amount. All of the injections are no more than equivalent to one drop, .05, and sometimes even less than that." (Id). Moreover, Lieberman admitted that Mrs. Madej's reactions were not tied to any exposure level:

> Q.      Is it tied to any kind of chemical percentage of the product, though – the reaction? Is it, if it's 5 percent, she'll react? If it's more than that she won't? What is the baseline?
>
> A.      ***No, you can't say that.***  You'll see in my notes that I often reflect this. When we talk about patients with chemical sensitivity, what differentiates you and me, for example, when it comes to exposure to toxic chemicals is the dose. There's no question about it.  But we are aware of these chemicals in doses of parts per million whereas these folks are aware of the presence of these things in parts per billion.  Now why is that important?  ***It's important because there's almost no way that you could clean up an environment which would be safe enough in the majority of people, and that's why they live very restricted in terms of their exposures.  And because in life, you have to expose yourself; there's no way you can't; you have to go places, do things sometimes, and you're going to be exposed is – they run the risk of reaction.  So when it comes to do they always react to a particular exposure?  Not necessarily.***

(ECF No. 91 at Page ID # 2914-2915.) (emphasis added).   Lieberman also indicated that any pesticide in any amount would be potentially life threatening for Mrs. Madej.  (Id. at Page ID #

2917.) Despite his opinions that exposure could be life threatening, Lieberman admitted that he

has never conducted any tests to determine if the three block radius, and subsequently the one

mile restriction, was necessary to prevent harm to Ms. Madej. (Id. at Page ID # 2921.)

Lieberman admitted that he never tested Mrs. Madej to determine if she is sensitive to "asphalt,"

and that he is not aware of the materials and substances of each variety of asphalt. (Id. at Page ID

# 2925.) He is also not aware of what substances the Engineer seeks to use on the road. (Id. at

Page ID # 2929.) Lieberman testified as follows regarding his analysis of asphalt's alleged harm

to Ms. Madej:

> Q. Then how did you determine that the potential exposure to asphalt could
> cause her to have respiratory or heart failure or paralysis? · How did you
> determine that?
>
> A. Well, it didn't say that's specific to asphalt, did it?
>
> Q. Well, it says, work to maintain roads and/or to clear vegetation poses a
> hazardous situation for this patient. · Exposure will cause her a wide variety of
> symptoms: · Migraines, shortness of breath, dizziness, heart racing, and could
> create a life-threatening situation, respiratory or heart failure, paralysis.
>
> A. Right.
>
> Q. So what did you mean when you said that? · That doesn't mean asphalt?
>
> A. No, not necessarily because it also could be the road. Many of the roads,
> for example, use herbicide in order to take down the vegetation and clear.
> Specifically, Ms. Madej in one of her letters specifically talks about becoming
> temporarily paralyzed from an exposure as she went past the field, for example.
> Now, what was in that field, I do not know.· The suggestion was that it was an
> ·agricultural product, most likely a pesticide.
>
> Q. Okay. Have you -- do you know what products the county engineer uses
> to maintain roads?
>
> A. No, I do not.
>
> Q. Do you know what products the county engineer uses to clear vegetation
> on roads?

17

A.      Specifically, no, I do not.

Q.      Do you have any evidence that work to maintain roads or to clear vegetation on roads would cause Ms. Madej to have respiratory failure to the point of death?

A.      I can't answer that specifically except, based upon my education, training, and experience, and especially the latter, for example, I have many patients who have become extremely sick as a result of herbicide and chemicals that were sprayed in order to clear vegetation from particular areas, especially utility poles which are near their homes.

Q.      Okay. And again, have you ever -- you never observed Ms. Madej become extremely sick as a result of herbicides, have you?

A.      No. Only historically.

Q.      What she told you, what she reported to you in her letter, correct?

A.      Yes. Yes. All of these letters, I think -- and you're correct -- because you're representing the County -- is because of her absolute panic that if she were to be exposed to these materials that she would become and remain quite sick. Now, experience with her historically is that reactions don't just last for minutes or hours; they can last for days, weeks, and sometimes even months, and we see that with the average patient who is designated as a chemically sensitive patient.

Q.      Okay.  Have you ever observed her having a reaction?

A.      No.

Q.      And when you wrote this letter, it had been 16 years since you had seen her, if at all? · You can't remember?

A.      That's right.

Q.      Did you talk to her?

A.      Oh, I'm sure I did. · Let's see to be exact.  The dates of 2015, yes. I see here in 2015, requests letter for asphalting. · March 24th, mold still a problem. · Vinyl sensitivity. · Looks forward to building her own home. · Those are the two '15 entries that I have.

Q.      · that's fine. So does that help – requested letter for asphalting. Did she call you and say, I don't want them to pave the road; put together a letter that says it will be life-threatening for me?

> A.     She needn't say life-threatening. I did. I added that because it could be. And I think the important point is trying to, as a matter of fact, get that point across that this woman bought a house which was built by Habitat of Humanities for some previously chemically sensitive patient, and she finally found an oasis.· And so she's trying to protect that oasis, and I'm trying to help her to do that.

(ECF No. 91 at Page ID # 2929.)  Finally, Lieberman admitted that the one mile restriction proposed in his letters is arbitrary.  (Id. at Page ID # 2930.)  He further testified that he has never evaluated Mrs. Madej for any of the proposed alternative products she has proposed that she claims will not harm her. (Id. at Page ID # 3095.)  Lieberman also admitted that the products Mrs. Madej seeks to mandate be used on Dutch Creek road could contain volatile organic compounds. (Id. at Page ID # 3096.)

Most importantly, Lieberman admitted that he is unable to identify with any degree of particularity what is causing issues for Mrs. Madej:

> Q.     And you're aware that there's presently an injunction on the road, correct?
>
> A.     I think so, yes.
>
> Q.     But yet, Ms. Madej is still ill and continues to treat with you, correct?
>
> A.     Yes.
>
> Q.     So is it possible that something else besides the road is causing her to be ill?
>
> ***A.     Oh. It's the entire environment which consists of the pollutants that we've been talking about.***

(Id. at Page ID # 2956.) (emphasis added).  The Sixth Circuit has held in cases involving hazardous substances that where the expert cannot isolate the causation for the patient's particular illness, their opinions are not sufficiently reliable under *Daubert*.  *Baker v. Chevron U.S.A., Inc.*, 533 F. App'x 509, 521 (6th Cir. 2013) (holding that failure to perform differential diagnosis, or to rule out non-benzene explanations disease for plaintiffs' illnesses rendered such

findings fatal.)  See also, *Pluck,* 640 F.3d at 679  (holding that where expert did not establish what level of exposure to benzene or whether such levels were beyond EPA guidelines and failure to rule out other causes such as cigarettes and alcohol invalidated methodology.)  In this case, Lieberman has directly testified that it is not one single substance for Mrs. Madej but rather, a theory of total load for all exposures.  (Id. at Page ID # 2951-2952.)  In fact, Lieberman testified that there would be no place that would be totally safe for Mrs. Madej, given her exquisite sensitivities.  (Id. at Page ID # 2955.)  As Lieberman's conclusions are not supported by any reliability methodology, as he has not seen the patient in over 19 years, and has failed to perform a differential diagnosis, his opinions do not establish the requirements of *Dauber* and R. 702 and therefore Dr. Lieberman's opinions must be excluded.

## III.    CONCLUSION

For these reasons, the Engineer seeks an order *in limine* excluding consideration of medical opinions by Singer and Lieberman, specifically as follows:

1.  whether Mrs. Madej suffers from MCS;

2.  whether Mrs. Madej has any particular sensitivity to petrochemicals and/or chemicals or particulates found in asphalt or chip seal products; and

3.  whether the chemicals and/or particulates found in asphalt or chip seal products will injury Mrs. Madej or cause her death.

4.  Prohibiting Mrs. Madej from relying on any testimony by Singer or Lieberman regarding her alleged disability or need for an accommodation.

The Engineer further requests that any reliance by Cynthia or Robert Madej to establish that opinions of Lieberman and Singer are the reason she requires an accommodation be stricken and not considered by this Court for purposes of summary judgment.

Respectfully submitted,

/s/ *Molly R. Gwin*
Mark Landes        (0027227)
mlandes@isaacwiles.com
Maribeth Meluch   (0055903)
mmeluch@isaacwiles.com
Molly Gwin         (0088189)
mgwin@isaacwiles.com
Isaac, Wiles, Burkholder & Teetor, LLC
Two Miranova Place, Suite 700
Columbus, Ohio 43215
P: 614.221.2121
F: 614.365.9516
*Attorneys for Defendant Athens County Engineer*
*Jeff Maiden*

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2018 a copy of the foregoing *Motion in Limine* was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ *Molly R. Gwin*
Molly R. Gwin (0088189)