UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**CYNTHIA MADEJ,** *et al.,*

       **Plaintiffs,**

       **v.**

**ATHENS COUNTY ENGINEER
JEFF MAIDEN,**

       **Defendant.**

**Case No. 2:16-cv-658
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Chelsey M. Vascura**

## OPINION AND ORDER

This matter is before the Court on Plaintiffs Cynthia and Robert Madej's ("Ms. Madej," "Mr. Madej", or collectively, "Plaintiffs") Motion for Partial Summary Judgment (*Pl.'s Mot. S.J.*, ECF No. 109), Defendant's memorandum in opposition (*Def. Mem. Opp.*, ECF No. 119), Plaintiffs' Reply (*Pl. Reply*, ECF No. 135), Plaintiffs' motion in limine to exclude the testimony of Jonathan Raab (*Pl. MIL*, ECF No. 138), Defendant's response (*Def. Response MIL*, ECF No. 141), and Plaintiffs' Reply (*Pl. Reply MIL*, ECF No. 143). Also before the Court are Defendant's Motion for Summary Judgment (*Def. Mot. S.J.*, ECF No. 117), Plaintiffs' memorandum in opposition (*Pl. Mem. Opp.*, ECF No. 120), Defendant's Reply (*Def. Reply*, ECF No. 134), Defendant's motion in limine to exclude the testimony of Dr. John Molot (*Def. MIL*, ECF No. 106), Plaintiffs' response (*Pl. Response MIL*, ECF No. 126), Defendant's Reply (*Def. Reply MIL*, ECF No. 134), Defendant's motion in limine to exclude the testimony of Dr. Barbara Singer and Dr. Allan Lieberman (*Def.'s MIL*, ECF No. 107), Plaintiffs' response (*Pl. Response MIL*, ECF No. 125), Defendant's Reply (*Def. Reply MIL*, ECF No. 133); Defendant's motion in limine to exclude Plaintiffs' engineering experts (*Def. MIL*, ECF No. 108), Plaintiffs' response

(*Pl. Response MIL*, ECF No. 124), and Defendant's Reply (*Def. Reply MIL*, ECF No. 132). Additionally, Defendant has filed a Motion for Leave to File a Sur-reply (*Def. Mot. Sur-reply*, ECF No. 140), Plaintiffs have filed a response (*Pl. Response Sur-reply*, ECF No. 144), and Defendant has filed a Reply (*Def. Reply*, ECF No. 145). The issues are joined and ripe for consideration. For the reasons that follow, Defendant's motions to exclude the opinions of Dr. John Molot (*Def.'s MIL*, ECF No. 106), and Dr. Barbara Singer and Dr. Allan Lieberman (*Def.'s MIL*, ECF No. 107) are well-taken, and are **GRANTED**. As a consequence of granting those motions, Defendant's motion for summary judgment (*Def. Mot. S.J.*, ECF No. 117) is also well-taken and is **GRANTED**, and the remaining motions are **DENIED as MOOT**.

## I. BACKGROUND

This dispute arose out of the road resurfacing "chip and seal" or "chip seal" project on Dutch Creek Road in Athens County, Ohio. (*Third Am. Comp.* ¶¶ 3, 4, ECF No. 16.) Residents complained that the dust on the road was affecting their health, and as part of his statutory obligation to maintain the roads of Athens County, the Engineer decided to chip seal Dutch Creek Road (*Def. Mot. S.J.*, ECF No. 117, p. 10.)

Plaintiffs allege that the completion of the "chip and seal" project within one mile of their residence could cause Mrs. Madej serious physical harm or even death. (*Id.* at ¶¶ 6, 7, 8, 11, 15, 23, 33, 39, 41, 42, 48.) Specifically, Plaintiffs allege that "Cindi suffers from chemical sensitivity, also known as environmental illness, which renders many substances used in road paving highly toxic to her, including but not limited to petrochemicals used in 'chip and seal' road surfacing." (*Id.*, at ¶ 4.) In support of their claims, Plaintiffs rely on three medical experts, John Molot, M.D., a Canadian physician whom they engaged as an expert witness, and treating physicians Barbara Singer, M.D. and Allan Lieberman, M.D. Discovery was completed in June, 2018, and the issues were fully joined on September 11, 2018.

2

## A. The State Court Preliminary Injunction

On September 15, 2015, Plaintiffs filed an action in state court against the Athens County Engineer, Jeff Maiden, in the Athens County Court of Common Pleas seeking "a temporary restraining order, preliminary injunction, and permanent injunction" to stop the paving project. (ECF No. 1-1, PgId 10). Judge Patrick Lang granted a temporary restraining order, and then replaced the temporary restraining order with a preliminary injunction on September 23, 2015, following a hearing on the preliminary injunction on September 21, 2015. (*Decision*, ECF No. 16, PgId 144.) The state court injunction remains in place, and Dutch Creek Road has not been resurfaced. (*Def. Mot. S.J.*, ECF No. 117, p. 2.)

During the hearing on the preliminary injunction, the Court heard testimony from Mr. Madej, and from Ms. Madej, who was permitted to testify via telephone, including testimony that Ms. Madej sleeps "in a small glass-lined room, with an old recliner being the only furniture she feels her health can tolerate. In winter, the only heat source in the room is a string of incandescent light bulbs, augmented on extremely cold nights by the addition of glass bottles filled with hot filtered water." (*Decision*, ECF No. 16, PgId 145-46.) The Court also heard testimony from Dr. Barbara Singer, who testified that Ms. Madej "is in extremely poor health, and suffers from ailments including anemia, several vitamin deficiencies, protein deficiency, anxiety and depression." (*Id.*, PgId 146.) "Dr. Singer testified that in her professional medical opinion, these symptoms are caused by extreme chemical sensitivity, and that Mrs. Madej would likely suffer severe physical injury or death if the project moved forward at the current time. Finally, Dr. Singer testified that hospitalization is not a viable option, because the plastics and chemicals used at hospitals would exacerbate Mrs. Madej's illness." (*Id.*) In granting the preliminary injunction, the Court explained:

> While there may be some cause to doubt the diagnosis, it is undisputed that Mrs. Madej is a very sick woman. The question of what is causing her symptoms is one for medical science. The Court is limited to deciding this Motion based only

upon the facts in evidence before it, and the only medical testimony offered at hearing is that Mrs. Madej is likely to suffer serious injury or death if the project moves forward at the present time. In the absence of contrary medical opinion, the Court is not willing to disregard Dr. Singer's testimony outright.

(*Id.*, PgId 149-50.) On June 30, 2016, Plaintiffs filed a second amended complaint adding federal claims, and on July 7, 2016, Defendant removed the case to this court. (ECF No. 1.)

## B. Plaintiffs' Third Amended Complaint

Plaintiffs filed a third amended complaint on October 18, 2016 ("complaint") asserting claims arising under the Fair Housing Amendments Act, 42 U.S.C. § 3601 *et seq.*, and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, as well as state-law claims. In addition to monetary relief, Plaintiffs seek an order enjoining Defendant Athens County Engineer Jeff Maiden ("Engineer" or "Defendant") from completing the road resurfacing "chip and seal" project, and a declaratory judgment to the effect that "should the defendant proceed with the threatened chip and seal project on the section of Dutch Creek Road extending from S.R. 550 to Stanley Road Mrs. Madej will suffer serious physical harm or death and that the Defendant will be liable for civil assault and battery and/or wrongful death." (*Third Am. Comp.*, ECF No. 16, PgId 138-39.) In support of the injunction, Plaintiffs attached as Exhibit 1 to the complaint an affidavit dated September 15, 2015, from Dr. Barbara Singer, Ms. Madej's treating physician, declaring that Ms. Madej "suffers from chronic chemical sensitivity resulting from toxic exposure." (*Singer Aff.*, ECF No. 16, Ex. 1, PgId 140.) "She also currently suffers from a life-threatening anemic condition as evidenced by very low hemoglobin levels and severe vitamin B12 deficiency, as well as extreme weight loss and cardiometabolic decompensation. She is in a precarious state and even small exposures to chemical stressors create a serious hazard for her." (*Id.*) Dr. Singer stated that Ms. Madej "requires limited exposure or avoidance of many common materials and chemicals which include but are not limited to: diesel, jet and

4

other fuels, exhaust, tar and asphalt, oil, herbicides and pesticides, smoke." (*Id.*) She stated that "[r]oadway construction and maintenance activities are of particular concern. Exposures, even in small amounts, to numerous volatile organic compounds found in petrochemical products like tar (*e.g.* anthracene, benzene, and phenols), many of which outgas for months are dangerous and even life-threatening for [Ms. Madej]. Potential impacts include: difficulty breathing, heart attack, paralysis, migraines, neurologic stress and damage." (*Id.*) Additionally, "[a]voiding exposure is crucial. [Ms. Madej] is unable to relocate from her home due to the severity and breadth of her sensitivities and the specialized living environment she requires." (*Id.*) "If [Ms. Madej's] road has a chip and seal or asphalt surface (or other surfacing that contains volatile organic compounds or toxins to which she is sensitive) especially while she is already in a weakened state from her anemia condition, weight loss, and cardiometabolic decompensation it is my opinion to a reasonable degree of medical certainty that she will suffer serious physical harm or possible death." (*Id.*, PgId 141.)

Count I seeks injunctive relief to prevent the paving of Dutch Creek Road with asphalt or chip seal (*Third Am. Comp.*, p. 1); Count II claims civil assault, battery, and/or wrongful death (*Id.*, p. 4); Count III seeks a declaratory judgment that, should Defendant proceed with chip seal Ms. Majed will suffer assault, battery and/or death (*Id.*, p. 5); Count IV claims a violation of the Fair Housing Amendments Act, 42 U.S.C. § 3601, *et seq.* (*Id.*); and Count V claims a violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* (*Id.*, p. 6.)

## II. EVIDENTIARY MOTIONS

Defendant moves to exclude the testimony of the Ms. Madej's treating physicians, Dr. Singer and Dr. Lieberman (*Def.'s MIL*, ECF No. 107); Plaintiff's medical expert, Dr. Molot (*Def.'s MIL*, ECF No. 106); and the three engineers (*Def.'s MIL*, ECF No. 108). Plaintiff moves

to exclude the opinion testimony of Defendant's geotechnical engineer, Mr. Raab (*Pl.'s MIL*, ECF No. 138). Both parties move to exclude this proffered expert testimony pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The parties have fully briefed the issues, filed the relevant reports, and have provided relevant portions of the experts' depositions.

## III. STANDARD

Federal Rule of Evidence 702 requires the trial judge to perform a "gatekeeping role" when considering the admissibility of expert testimony. *Daubert*, 509 U.S. at 597. The rule provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> ( a ) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> ( b ) the testimony is based on sufficient facts or data;
>
> ( c ) the testimony is the product of reliable principles and methods; and
>
> ( d ) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Supreme Court explained the gatekeeping role:

> To summarize: "General acceptance" is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence, but the Rules of Evidence—especially Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands.

*Daubert*, 509 U.S. at 597.

The Sixth Circuit has described the district court's gatekeeping function under *Daubert* as an "obligation ... to exclude from trial expert testimony that is unreliable and irrelevant." *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (internal quotation marks omitted). The gatekeeping role progresses in three steps: First, the witness must be qualified according to his or her "knowledge, skill, experience, training, or education." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting Fed. R. Evid. 702). Second, the expert's testimony must be relevant, in that it will help "the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (same). On this point, the Court's inquiry focuses on whether the expert's reasoning or methodology can be properly applied to the facts at issue. *See Daubert*, 509 U.S. at 591-93. Third, the testimony must be reliable. *See Kendall Holdings, Inc. v. Eden Cryogenics, LLC*, No. 2:08-cv-390, 2013 WL 53661 (S.D. Ohio Sept. 24, 2013). To determine whether expert testimony is "reliable," the court's role, and the offering party's responsibility, "is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). Generally, the expert's opinions must reflect "scientific knowledge . . . derived by the scientific method," representing "good science." *Daubert*, 509 U.S. at 590, 593. Reliability hinges on whether the reasoning or methodology underlying the testimony is scientifically valid. *See Daubert*, 509 U.S. at 590. The expert must ground his or her testimony in the methods and procedures of science and must entail more than unsupported speculation or subjective belief. *Id.* Plaintiffs bear the burden to prove by a preponderance of the evidence that the testimony is reliable. *Wellman v. Norfolk & Western Railway Co.*, 98 F. Supp.2d

919, 923 (S.D. Ohio 2000) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)).

*Daubert* outlines several factors for courts to consider to help determine reliability, including "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 593-94). This inquiry is "flexible," however, and *Daubert's* factors "do not constitute a definitive checklist or test." *Kumho Tire Co.*, 526 U.S. at 150 (emphasis in original, citation and internal quotation marks omitted). The Court's gatekeeper role "is not intended to supplant the adversary system or the role of the jury." *Wellman v. Norfolk and Western Ry. Co.*, 98 F.Supp.2d 919, 924 (S.D. Ohio 2000) (citing *Daubert*, 509 U.S. at 596). Rather, it is "to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." *Id.*

## IV. DISCUSSION

The inquiry of whether a witness qualifies as an expert depends on his or her "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. After review of the expert's qualifications, the district court makes this determination as a preliminary question under Fed. R. Evid. 104(a). *Kingsley Associates, Inc. v. Del-Met, Inc.*, 918 F.2d 1277, 1286 (6th Cir. 1990). In doing so, the district court "has broad discretion in the matter of the admission or exclusion of expert evidence." *United States v. Kalymon*, 541 F.3d 624, 636 6th Cir. 2008) (quoting *United States v. Demjanjuk*, 367 F.3d 623, 633 (6th Cir. 2004)). As a guiding principle, the decision of whether to allow expert testimony depends on whether "it will assist the trier of fact." *Id.* "The issue with regard to expert testimony is not the qualifications of a witness in the

abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994).

## A. Medical Causation

Plaintiffs' complaint asserts that "[Ms. Madej] suffers from chemical sensitivity, also known as environmental illness, which renders many substances used in road paving highly toxic to her, including but not limited to petrochemicals used in 'chip and seal' road resurfacing." (*Third Am. Comp.*, ¶ 4, ECF No. 16.) In cases involving exposure to toxic substances, the plaintiff "must establish both general and specific causation through proof that the toxic substance is capable of causing, and did cause, the plaintiff's alleged injury." *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 677 (2011). Thus, causation has two levels, general and specific, and a plaintiff must prove both. As to specific causation, "[t]he plaintiff must show that [s]he was exposed to a toxic substance and that the level of exposure was sufficient to induce the complained-of medical condition (commonly called the 'dose-response' relationship')." *Valentine v. PPG Indus., Inc.*, 158 Ohio App.3d 615, 821 N.E.2d 580, 588 n. 1 (2004).

> General causation establishes whether the substance or chemical at issue is capable of causing a particular injury or condition in the general population. [*Terry v. Caputo*, 115 Ohio St.3d 351, 875 N.E.2d 72, 76 (2007)]. If the plaintiff establishes general causation, then she must establish specific causation. Specific causation establishes whether the substance or chemical in fact caused the plaintiff's medical condition. *Id.* at 77. In order to establish both general causation and specific causation, the plaintiff must present expert medical testimony. *Id.* at 74 syl. 2. Without expert medical testimony on both general causation and specific causation, a plaintiff's toxic tort claim will fail. *Id.* syl. 3.

*Baker v. Chevron USA, Inc.*, 680 F.Supp.2d 865 (2010).

It is well-established in the Sixth Circuit that employing a differential diagnosis is an appropriate means to establish causation. *See Best v. Lowe's*, 563 F.3d 171, 178-80 (6th Cir. 2009) (citing *Hardyman v. Norfolk & Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001) ). "Differential

diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Hardyman*, 243 F.3d at 260. "A differential diagnosis seeks to identify the disease causing a patient's symptoms by ruling in all possible diseases and ruling out alternative diseases until (if all goes well) one arrives at the most likely cause." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 674 (6th Cir. 2010). "[C]ourts must apply the *Daubert* principles carefully in considering [etiology]. 'The ability to diagnose medical conditions is not remotely the same . . . as the ability to deduce . . . in a scientifically reliable manner, the causes of those medical conditions.' *Gass v. Marriott Hotel Servs., Inc.*, 501 F.Supp.2d 1011, 1019 (W.D. Mich. 2007), *rev'd on other grounds*, 558 F.3d 419 (6th Cir. 2009). Doctors thus may testify to both, but the reliability of one does not guarantee the reliability of the other." *Id.* at 673-74.

In the case at bar, Plaintiffs assert that Ms. Madej suffers from multiple chemical sensitivity ("MCS") or environmental illness. Plaintiffs claim that the petrochemicals inherent in chip seal will undoubtedly cause her serious physical injury or death. In order to prevail on that theory, Plaintiffs must establish both general and specific causation by proving by a preponderance of the evidence that these petrochemicals in chip seal are capable of causing and will in fact cause the threatened injury. *Pluck*, 640 F.3d at 677.

### 1. Dr. Molot

Plaintiffs retained as an expert witness Dr. John Molot, a Canadian physician who also works on a Canadian task force studying the gaps in science surrounding MCS, fibromyalgia, and chronic fatigue syndrome. (*Molot Dep.*, ECF No. 95, PgId 3288, 3292.) Dr. Molot explained that environmental medicine is not a recognized board certification, and he is not board certified in any medical specialty. (*Id.*, PgId 3311.) Dr. Molot explained that MCS is

"diagnosed by the history and the history is somewhat complex." (*Id.*, PgId 3302.) The history

is the subjective criteria as relayed by the patient. (*Id.*)

> A. So part of that, of course, is to – there's a pattern to these patients that is common. Usually middle-aged women. They have multiple system complaints. The brain is the most common system involved. We usually see complaints of pain, fatigue, poor cognition, mood change. Tied for second place are probably respiratory and/or gastrointestinal complaints. To start to see a pattern. And respiratory complaints may – will include both upper and lower respiratory system. Upper respiratory, possibly partially explained by allergy. Allergies are more common. I'm talking about classical allergy. These patients will also complain of lower respiratory symptoms. So asthma is more common. So you start to identify patterns.

> Q. Is there an objective analysis that can be performed for multiple chemical sensitivity? Does blood work show multiple chemical sensitivity?

> A. No. There are no blood tests that will demonstrate chemical sensitivity. There are no clinical tests. So it's one of those conditions which is made by making sure there is no other biological phenomena that could explain these symptoms and – but like I said, there are no biological markers.

> \*\*\*
> Q. How do you control for – how do you control for the other variables and determine that it's asphalt in patients that are exquisitely sensitive?

> A. How do you control for that? You know, patients make their observations based on, I smelled this and it makes me sick. And that's all we have.

(*Id.*, PgId 3302-3303, 3324.) Dr. Lieberman explained further that he has "no idea" which

chemicals Ms. Madej is reacting to, "because there's no way to test it." (*Id.*, PgId 3338.)

> Q. Okay and Ms. Madej's complaints are not related solely to the indoor quality of her home, correct?

> A. Correct.

> Q. They're related to the use of chip seal and the outdoor air quality, correct?

> A. That's what the issue is, but her medical condition is that she is sensitive to a variety of different chemicals.

Q. Can you identify with any specificity what those chemicals are?

A. Only from the history of what the patient identifies.

Q. Okay. There's no way to test if she's actually sensitive to those?

A. No.

(*Id.*, PgId 3339-3340.)

Q. … What symptoms did you observe her demonstrate when exposed to chip and seal?

A. I've never observed her demonstrate any symptoms. I had not exposed her to chip seal.

Q. Okay. So it's your testimony that diagnosis for this condition is based strictly on a subjective criteria of history and reported symptoms; is that correct?

A. Yes.

Q. And you've never observed her display sensitivity to chip and seal, correct?

A. Correct.

Q. And you've never observed her display sensitivity to asphalt products?

A. Correct.

Q. Have you ever observed her display sensitivity to anything?

A. I spent a couple hours with her outside in a rural environment on a lovely sunny day with a minimal breeze if there was one at all. I don't remember. It was just a lovely day. And as a Canadian, I have great appreciation of those lovely days. So that's my memory of it. And the purpose of being in that environment was so that it would be tolerated by her, that I could talk to her and do the physical exam. So that's my experience in being with Ms. Madej to make observations clinically.

… Sorry? Did she display sensitivity to anything to me? No.

(*Id.*, PgId 3341- 3342.) Dr. Molot explained that he based his opinion on the "couple of hours"

he spent with her during that one clinical visit, and on clinical notes and records from other physicians. (*Id.*, PgId 3349.) He did not recall asphalt sensitivity being mentioned in the medical records until September of 2015. (*Id.*, PgId 3350.)

Q. Do you recall whether or not Dr. Lieberman ever tested Ms. Madej for petroleum products?

A. That testing technique uses various mixtures. I do not recall whether — what exactly he used, but some of them represent petroleum products, could be natural gas, could be something else again, I'm not sure where he got his substances for testing from.

Q. So could we say that that test would not be a reliable biological indicator of MCS?

A. Yeah, the testing for sensitivity using sublingual challenges has not been documented as reliable for the diagnosis of chemical sensitivity.

Q. And if Dr. Lieberman testified that he had no medical evidence that Ms. Madej would die if she was exposed to asphalt or chip seal, would that change your medical opinions in this report?

A. No.

Q. Do you believe Ms. Madej will die if the road is chip sealed?

A. Extremely unlikely, maybe change extremely to highly. Yeah.

Q. Have you ever seen a patient die from multiple chemical sensitivity strictly?

A. Have I seen that? No.

Q. Have you ever seen a patient die from chronic fatigue syndrome?

A. No.

Q. Have you ever seen a patient die from fibromyalgia?

A. No.

Q. So is it fair to say these are not life threatening conditions?

13

A. No, they're not. What they do create is a biological response.

(*Id.*, 3350-3351.) Dr. Molot further opined that he did not think chip sealing the road would cause cardiac arrest, paralysis, or respiratory failure. (*Id.*, PgId 3353.) Dr. Molot also testified that he has no evidence that the alternative products Plaintiffs prefer to chip seal would be safe for Ms. Majed. "Q. Have you ever tested her for exposure to any of these alternative products? A. There's no test available. Q. Okay. Have you ever seen her become symptomatic around any of these alternative products? A. I only spent two hours with her." (*Id.*, PgId 3389.)

Assuming *arguendo* that general causation was proved (and the Court is not convinced that is is), it is Plaintiffs' burden to establish specific causation. "When specific causation of an injury is at issue, the Sixth Circuit requires that the expert conduct a 'differential diagnosis' in order to prove such causation." *Best*, 563 F.3d 179; *Pluck*, 640 F.3d at 678, *Tamraz*, 620 F.3d at 674. (*Def. MIL*, ECF No. 106, p. 4.) Plaintiffs assert that Dr. Molot did a complete differential diagnosis, and they offer an affidavit from Dr. Molot dated June 28, 2018 (*Pl. Response MIL*, ECF No. 126, pp. 12-13.) Dr. Molot's affidavit states in relevant part:

> I did complete a differential diagnosis in diagnosing Ms. Madej with MCS as follows:
>
> I reviewed all the medical records for Ms. Madej as well as other pertinent information regarding this case (notably lab tests), and conducted an extensive history from birth to present requiring more than 5 hours to complete. That history included an environmental exposure history. I also administered and reviewed approximately 80 pages of validated and standardized medical test questionnaires to assess other conditions as well as function and disability and reviewed all laboratory data (including blood work, an x-ray, and an EKG which were performed on Ms. Madej at the request of her treating physicians within a week prior to the physical exam), all of which were used to identify potential medical or psychological conditions that would require further consideration. I conducted a physical exam of Ms. Madej including vital signs, evaluating her appearance and effect, mobility, examining her eyes, ears, nose, and throat, performed a NASA lean test, Romberg and tandem gait with multitasking to rule out balance disorders. I listened to her heart and lungs, tested her reflexes, conducted an

abdominal exam, and examined her skin. I examined her joints and muscle strength and performed an evaluation of tender points. She did not present with edema or other physical findings at that time. I observed her coordination, affect, mood, and body language. Nothing from this examination, Ms. Madej's history, or the recent blood work and tests were indicative of a need for further tests. The medical condition has been present for many years. There were numerous lab tests performed by medical practitioners during these many years that were all normal indicating no need to be repeated. I used case criteria to evaluate her for multiple conditions, and eliminated a multitude of possible explanations for her complaints.

(*Molot Aff.*, ECF No. 122, ¶¶ 16-17.)

Defendant asserts that Dr. Molot's affidavit contradicts his testimony. (*Def. Response MIL*, ECF No. 134, p. 2.) To the extent that the affidavit contradicts Dr. Molot's prior testimony, such testimony is inadmissible. *See Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 302-303 (6th Cir. 1998). However, even if the affidavit is accepted, it is insufficient to establish specific causation. Dr. Molot's affidavit states that "[t]he medical condition has been present for many years." Ms. Madej's alleged sensitivity to chip seal was first raised in 2015. There is simply no medical evidence to support the assertion that the specific chemicals in chip seal are the cause Ms. Madej's illness. "Specific causation establishes whether the substance or chemical in fact caused the plaintiff's medical condition." *Baker*, 680 F.Supp.2d, at 874. As the Sixth Circuit explained in *Tamraz*:

Calling something a "differential diagnosis" or "differential etiology" does not by itself answer the reliability question but prompts three more: (1) Did the expert make an accurate diagnosis of the nature of the disease? (2) Did the expert reliably rule in the possible causes of it? (3) Did the expert reliably rule out the rejected causes? If the court answers "no" to any of these questions, the court must exclude the ultimate conclusion reached. *See Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 179 (6th Cir. 2009).

620 F.3d at 674.

Whether or not Dr. Molot attempted to conduct a differential diagnosis, his testimony is insufficient to answer "yes" to the reliability questions, and does not supply the needed proof

that the products in chip seal are the cause of Ms. Madej's injury. As the Sixth Circuit noted in *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 253 (6th Cir. 2001), "an association does not mean there is a cause and effect relationship." "Before any inferences are drawn about causation, the possibility of other reasons for the association must be examined, including chance, biases such as selection or informational biases, and confounding causes." *Id.* More is required than simply proving the existence of the presence of a toxin in the environment – there must be proof that the level of the toxin present caused the plaintiff's symptoms. *Id.* In the case at bar, "[t]here is 'too great an analytical gap between the data and the opinion proffered' for the court to admit [Dr. Molot's] opinion as testimony." *Tamraz*, 620 F.3d at 675-76. His testimony is also insufficient to support a finding that the proposed alternatives to chip seal would be safe for Ms. Majed.

The Court finds that Dr. Molot's causation opinions are not reliable under the standards enunciated by *Daubert* and, consequently, are inadmissible. Accordingly, Defendant's motion to exclude the opinions of Dr. Molot is well-taken and is **GRANTED**.

### 2. *Dr. Singer*

Ms. Madej began treating with Dr. Singer in 2011. (*Singer Dep.*, ECF No. 81, PgId 1640.) Dr. Singer is a board certified primary care physician who holds a doctorate of Osteopathic Medicine. (*Id.*, PgId 1631.) She testified that, in the past, Ms. Madej has traveled by car to her medical facility, and she examined her outside of the building, on the concrete pavement, which ran from an asphalt road. (*Id.*, PgId 1660.) This protocol was used because Ms. Madej thought the cleaning products, paints, and carpeting inside the building would make her ill. (*Id.*, PgId 1657.) Dr. Singer testified that she has never examined another patient outside, before or since Ms. Majed. (*Id.*) Dr. Singer testified that she does not have the skill set

to diagnose MCS. (*Id.*, PgId 1663.) "I don't know the criteria for diagnosing multiple chemical sensitivity." (*Id.*, PgId 1664.) For that diagnosis, she relied on Ms. Madej's statements and a letter from Dr. Lieberman.

> Q. You never spoke with Dr. Lieberman regarding any of the tests he did on Miss Madej to assess her for her claim of multiple chemical sensitivity?
>
> A. No, I didn't.
>
> Q. And she never told you, hey, he did allergy testing, prick testing?
>
> A. No.
>
> Q. She just presented and said, I have this?
>
> A. Correct. And I did have the letter.

(*Id.*, PgId 1665.)

> Q. Did you ever test her for petrochemicals or organic compounds?
>
> A. I don't even know where we begin with that, if there are tests that are accurate for that. That's again in that chemical sensitivity specialty that I don't have.

(*Id.*, PgId 1690.)

> Q. What evidence do you have that external chemical stressors caused these symptoms?
>
> A. I have just the letter from Dr. Lieberman and her reports.

(*Id.*, PgId 1740.)

> Q. So these symptoms that are characteristic of her MCS, these are all subjective, meaning she reported them, correct?
>
> A. Right. So I'm looking at an ill appearing patient who's saying this is why, and this is what I'm experiencing.
>
> Q. But they were not objectively measured symptoms, correct?

A. Because I don't even know how you do that, because it's not my field.

(*Id.*, PgId 1723.)

> Q. Okay. And then you've concluded that if the road – Cynthia's road – has chip and seal or asphalt surface or other surfacing that contains volatile organic compounds or toxins, coupled with her weakened state, that she'll suffer physical harm or possibly death?
>
> A. She may. . . . I don't know what state she's in now, but back then she had just barely come through what I though was a very frightening experience.
>
> Q. What evidence do you have that any of that was based on the use of chip and seal?
>
> A. I don't know that it was. I just think I you take a vulnerable organism and you subject them to their stressors, you put them at risk.
>
> Q. But how did you know that those things were going to stress her?
>
> A. Because she had the diagnosis of multiple chemical sensitivity from Dr. Lieberman.

(*Id.*, PgId 1752.)

Dr. Lieberman testified that he did not diagnose Ms. Majed as having multiple chemical sensitivity, as that is not a diagnosis, but is rather a description. (*Lieberman Dep.*, ECF No. 91, PgId 2941.) As Defendant notes, Dr. Singer testified that MCS or environmental illness is not recognized by the American Medical Association, the World Health Organization, or the ICD-10 (International Statistical Classification of Diseases and Related Health Problems or "International Classification of Diseases"), a medical classification list of the World Health Organization. (*Def. Mot. S.J.*, ECF No. 117, p. 16 (citing *Singer Dep.*, ECF No. 81, PgId 1792-1793, 1767).) Dr. Singer further concedes that she "does not have the skill set" to speak to a diagnosis of MCS. Rather, she had diagnosed Ms. Majed with, among other things, severe anemia, lack of protein, and gastrointestinal orders. (*Id.*, PgId 1674, 1686, 1748, 1784.)

Regarding Ms. Majed's precarious health, Dr. Singer conceded, "I still don't know what caused all of this, you know, but something did. Something caused all this." (*Id.*, PgId 1779.) This is not sufficient information to support a differential diagnosis. As the Sixth Circuit explained in *Tamraz*, "testimony still must be judged by its methodology, not its conclusion." 620 F.3d at 675.

As for the letter that she wrote to the County Engineer recommending that construction or maintenance activities not occur within one mile of the Madej home, Dr. Singer concedes that the one mile distance paving restriction was based solely on the request from the Madejs. (*Singer Dep.*, ECF No. 81, PgId 1790.)

Q. You never did any independent analysis?

A. No.

Q. You never went out and saw the property? They said, a mile, and you put that in there?

A. Correct.

(*Id.*) Furthermore, when asked to opine about the list of alternatives to chip and seal proposed by the Plaintiffs as their preferred alternatives to chip seal, Dr. Singer testified that she is not familiar with any of these compounds. (*Id.*, PgId 1755.) As Dr. Singer concedes, she is "not a specialist in chemical sensitivity." (*Id.*, PgId 1799.)

While it is clear that Dr. Singer is a caring physician, her testimony is insufficient to support a finding of specific causation that Ms. Majed's illness is caused by the chemicals in chip seal, and is also insufficient to support a finding that the proposed alternatives to chip seal would be safe for Ms. Majed. The Court finds that Dr. Singer's causation opinions are not reliable under the standards enunciated by *Daubert* and, consequently, are inadmissible.

Accordingly, Defendant's motion to exclude the opinions of Dr. Singer is well-taken and is **GRANTED**.

### 3. Dr. Leiberman

Ms. Madej's primary treating physician, Dr. Allan Lieberman, is the sole shareholder of The Center for Occupational and Environmental Medicine ("Center") in Charleston, South Carolina. (*Lieberman Dep.*, ECF No. 91, PgId 2897.) Dr. Lieberman testified that MCS is not a diagnosis, but it is a description. (*Id.*, PgId 2941.) He explained that he "did not diagnose [Ms. Madej]. There is no diagnosis of multiple chemical sensitivities. . . ." (*Id.*, PgId 2961.) The only time Ms. Madej appeared at the Center in person was in 1999, and she was not seen by Dr. Lieberman personally, but was seen by his colleague. (*Id.*, PgId 2980, 2903.) Dr. Lieberman has treated Ms. Madej via telephone, except for a hiatus in treatment from 2000 through 2006. (*Id.*, PgId 3000.) Defendant asserts that it is undisputed that, prior to 2015, Ms. Madej had never mentioned a sensitivity to asphalt. (*Def. MIL*, ECF No. 107, p. 5, citing *Lieberman Dep.*, ECF No. 91, PgId 3058.) Dr. Lieberman testified that the only testing conducted on Ms. Madej at her initial visit consisted of placing a substance he described as "petroleum derived ethanol" under her tongue. (*Lieberman Dep.*, ECF No. 91, PgId 3086.) He did not test Ms. Madej to determine whether she was sensitive to "asphalt":

Q. Is asphalt a generic term?

A. Yes.

Q. So there are varieties of different asphalts, correct?

A. Yes.

Q. And they don't all have the same chemical composition, correct?

20

A. And probably each batch is probably different because they're rather crude materials.

Q. Did you ever administer any tests to determine if she was sensitive to asphalt other than the discussions we've had already?

A. No.

Q. Other than what you've told me about already?

A. Not specific to asphalt, no.

A. Only that asphalt is a petrochemical.

Q. Then how did you determine that the potential exposure to asphalt could cause her to have respiratory or heart failure or paralysis? How did you determine that?

A. Well, it didn't say that's specific to asphalt, did it?

Q. Well, it says, work to maintain roads and/or to clear vegetation poses a hazardous situation for this patient. Exposure will cause her a wide variety of symptoms: Migraines, shortness of breath, dizziness, heart racing, and could create a life-threatening situation, respiratory or heart failure, paralysis.

A. Right.

Q. So what did you mean when you said that? That doesn't mean asphalt?

A. No, not necessarily because it also could be the road. Many of the roads, for example, use herbicide in order to take down the vegetation and clear. Specifically, Ms. Madej in one of her letters specifically talks about becoming temporarily paralyzed from an exposure as she went past the field, for example. Now, what was in that field, I do not know. The suggestion was that it was an agricultural product, most likely a pesticide.

Q. Okay. Have you -- do you know what products the county engineer uses to maintain roads?

A. No, I do not.

Q. Do you know what products the county engineer uses to clear vegetation on roads?

A. Specifically, no, I do not.

Q. Do you have any evidence that work to maintain roads or to clear vegetation on roads would cause Ms. Madej to have respiratory failure to the point of death?

A. I can't answer that specifically except, based upon my education, training, and experience, and especially the latter, for example, I have many patients who have become extremely sick as a result of herbicide and chemicals that were sprayed in order to clear vegetation from particular areas, especially utility poles which are near their homes.

Q. Okay. And again, have you ever -- you never observed Ms. Madej become extremely sick as a result of herbicides, have you?

A. No. Only historically.

(*Id.*, PgId 2925-2927.)

Dr. Lieberman testified that Ms. Madej stated she had been exposed to the pesticide Dursban in the 1990's, but he did not know at what dose or for what period of time. (*Id.*, PgId 2986.) "[I]t's the toxic exposure to organophosphate pesticide that's her diagnosis, and she manifests all of these signs and symptoms related to that." (*Id.*, PgId 2965.) However, Dr. Lieberman testified that other tests also found arsenic:

Q. Has blood work that's been performed ever revealed high percentages of toxic elements?

A. She underwent hair analysis and urine analysis looking for heavy metals, and the only one that was found was arsenic, and the arsenic is in her. Unfortunately, it's in all of us now because if we eat a lot of rice – and she eats rice two to three times a day. Rice, unfortunately, is heavily contaminated with arsenic, and that's what you're picking up in Madej, for example, with regard to the arsenic. Now, I did a cholinesterase level on her, and . . . I believe that supports the fact that she's constantly being exposed to organophosphate pesticides . . . .

(*Id.*, PgId 2965-2966.)

Q. Is there any living environment that would be totally safe for Ms. Madej, given her exquisite sensitivities?

A. No. Everything is relative.

Q. And you're aware that there's presently an injunction on the road, correct?

A. I think so, yes.

Q. But yet, Ms. Madej is still ill and continues to treat with you, correct?

A. Yes.

Q. So is it possible that something else besides the road is causing her to be ill?

A. Oh. It's the entire environment which consists of a lot of the pollutants we've been talking about here –

\*\*\*

Q. She had a lengthy history of medical problems even prior to 1999, it's your testimony, correct?

A. Oh, yes.

\*\*\*

Q. And when she came to you in 1999, you did not believe the cause of her illness was asphalt, correct?

A. Correct.

(*Id.*, PgId 2954-2955, 2957, 2961.) Dr. Lieberman testified that one of the basic principles of environmental medicine is the "concept of total load":

Q. …And we've had a lot of testimony regarding [Ms. Madej's] vulnerability. Does that have anything to do with paving the road, though, from a medical standpoint?

A. No. But one of the basic principles of environmental medicine is the concept of the total load, and part of that total load certainly would be nutrition, and nutrition was a very big concern for us, as we noticed that her weight – when I believe I looked was like 125 pounds. She's 5 foot 7 ½, if I recall correctly, and so she was sort of thin to being with. And then she goes all the way down, I think, to maybe 107 or 117. So she's lost quite a bit of weight because she's so restricted in terms of what she's eating, and that was a big danger for her. And I noticed that Dr. Weirs, probably in 2018 or '17, cautions her that she has to try to eat even if she doesn't want to.

Q. Yes. Absolutely. And again, her nutrient deficiencies, they are not related at all to the substance that the engineer uses on the road.

A. Yes. That's correct.

(*Id.*, PgId 2039-2940.)

Q. Do any of your other patients who have been exposed to Dursban seek an accommodation regarding paving a mile around their home?

A. Not to my knowledge.

Q. And is it conceivable that even if an accommodation is provided, Ms. Madej could still be sick?

A. Yes.

(*Id.*, PgId 2966-2967.)

Dr. Lieberman testified that he wrote three letters of medical necessity in September 2015 at the request of Ms. Madej. In his letter of September 2, 2015, he described her as suffering from "severe chemical sensitivity" and that she could be placed "in a life threatening situation by even minimal exposures to common materials and chemicals, particularly those originating from petrochemicals." Examples include heribicides/fertilizers, pesticides, petroleum products such as tar and blacktop, oil, fuels, exhaust, paints, varnishes and polyurethanes, and smoke combustion by-products. (*Id.*, PgId 3135.) The letter stated that Ms. Madej should be contacted "a minimum of three days before initiating any road construction or maintenance activity within 1 mile of her residence." (*Id.*) The September 4, 2015 letter changes the requirement from notification to restriction such that activities must be restricted within one mile from her home. (*Id.*, PgId 3137.) Finally, Dr. Lieberman wrote a September 10, 2015 letter of necessity, also requesting that activities be avoided within one mile of Ms. Madej's home:

To Whom It May Concern:

Cynthia Madej has been under my care for the past 15 years for severe chemical sensitivity from toxic chemical exposure that has resulted in her being legally disabled since 1997. Because of her sensitivities, she can be placed in a life-threatening situation by even minimal exposures to many common materials and chemicals, particularly those originating from petrochemicals. Examples of some of the concerning chemicals include: herbicides/fertilizers, pesticides, petroleum products such as tar and blacktop, oil, fuels: exhaust, paints, varnishes, polyurethanes, and smoke/combustion bi-products.

Work to maintain roads and/or to clear vegetation poses a hazardous situation for this patient. Exposures cause her a wide variety of symptoms (migraines, shortness of breath, dizziness, heart racing) and could create a life-threatening situation (respiratory or heart failure, paralysis).

Avoidance of exposures is essential for Cynthia. She cannot relocate from her residence to avoid exposure, even for short periods, because she requires specialized living conditions that cannot be easily replicated. Remaining indoors with the windows closed does not provide adequate protection against chemical stressors because of the level of her sensitivity. At this time, avoidance is the only viable protection.

To avoid risk to my patient, it is strongly advised that activities be avoided within 1 mile of her residence. It is also strongly advised that Cynthia is contacted prior to a minimum of 3 days before initiating any road construction or maintenance activity within 1 mile of her residence.

(*Id.*, PgId 3137.)

Dr. Lieberman testified that he believed the reason he wrote the letters was to support Ms. Madej's request for an injunction. The letters were not based on new medical evidence. (*Id.*, PgId 2936.) Dr. Lieberman also conceded that the one mile restriction on road paving was arbitrary. (*Id.*, PgId 2930.)

Plaintiffs assert that Dr. Singer and Dr. Lieberman, the treating physicians, should be permitted to testify "like any other witness," that is, like a fact witness. (*Pl. Response MIL*, ECF No. 125, p. 6.) However, the issue is not whether Ms. Madej is ill. The issue is whether chip seal caused or will cause her illness. The testimony is that there is no safe exposure to any

environmental pollutant for someone as sensitive as Ms. Madej, and this testimony would not help the trier of fact determine whether chip seal will harm the plaintiff and whether she has proven both general and specific causation.[1] Additionally, Plaintiffs assert that "[a]s to recognition by leading medical authorities, at a 1996 World Health Organization (WHO) conference, the conferees recommended that a different term, Idiopathic Environmental Intolerance (IEI), be used instead of MCS, and called for continuing research on the condition." (*Id.*, p. 8.)[2] However, this information is not sufficient to meet the *Daubert* standard for reliability as to long-term or permanent symptoms arising from the exposure to a particular toxic chemical.

> The issue is the reliability of his opinion from a *legal* perspective. And what science treats as a useful but untested hypothesis the law should generally treat as inadmissible speculation. As the Supreme Court has explained, "[t]he scientific project is advanced by broad and wide-ranging considerations of a multitude of hypotheses, for those that are incorrect will eventually be shown to be so . . . . Conjectures . . . are of little use, however, in the project of reaching a quick, final, and binding legal judgment – often of great consequence – about a particular set of events in the past." *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786. "Law lags science; it does not lead it." *Rosen* [*v. Ciba-Geigy Corp.*, 78 F.3d 316] at 319 [(7th Cir. 1996)].

*Tamraz*, 620 F.3d at 677.

Defendant also asserts that Dr. Lieberman's affidavit of June 28, 2018 contradicts his testimony. (*Def. Reply MIL*, ECF No. 133, p. 5.) To the extent that the affidavit contradicts Dr. Lieberman's prior testimony, such testimony is inadmissible. *See Compton*, 142 F.3d at 302-303. The affidavit attempts to clarify Dr. Lieberman's testimony regarding exposure levels.

---

[1] After the state court granted the paving injunction, Dr. Lieberman wrote a letter to the County Engineer on February 26, 2016, stating that the County should refrain from "spraying chemicals within a three mile radius of [Ms. Madej's] above stated address." (*Id.*, PgId 3138.)

[2] A condition described as idiopathic, meaning one for which the cause is unknown, is by definition not linked to chip seal asphalt or any other specific chemical.

(*Lieberman Aff.*, ECF No. 121.)  He states that Ms. Madej's sensitivity level is tied to small amounts, like parts per billion.  However, "the mere existence of a toxin in the environment is insufficient to establish causation without proof that the level of exposure could cause the plaintiffs' symptoms."  *Pluck*, 650 F.3d at 679.  The information Dr. Lieberman relies upon for this opinion is based solely on Ms. Majed's self-reports of when she felt she had symptoms. (*Lieberman Aff.*, ECF No. 121, ¶ 5.) In any event, even with the additional information provided in the affidavit, there is no differential diagnosis evidence or other evidence sufficient to tie Ms. Majed's numerous symptoms and long years of illness to the chip seal at issue. The Court finds that Dr. Leiberman's causation opinions are not reliable under the standards enunciated by *Daubert* and, consequently, are inadmissible.  Accordingly, Defendant's motion to exclude the opinions of Dr. Leiberman is well-taken and is **GRANTED**.

### B.  Summary Judgment

Defendant moves for summary judgment, asserting that Plaintiffs "have no evidence that the emissions from an application of chip seal are injurious to the residents along the road generally, and no medical evidence that it will cause Ms. Madej's alleged individual symptoms, or further injury." (*Def. Mot. S.J.*, ECF No. 117, p. 2.) Defendant's motion is well-taken. In the absence of a valid, scientific basis to support a finding of specific causation, Plaintiffs are unable to establish a genuine issue of fact for trial.

Count I seeks permanent injunctive relief to prevent the paving of Dutch Creek Road with asphalt or chip seal. (*Third Am. Comp.*, ECF No. 16, p. 1.) The standard for granting a permanent injunction requires that Plaintiffs demonstrate "(1) that they will suffer a continuing irreparable injury if the court fails to issue an injunction; (2) that there is no adequate remedy at law; (3) that, considering the balance of hardships between the plaintiffs and defendant[], a

remedy in equity is warranted; and (4) that it is in the public's interest to issue the injunction." *Sherful v. Gassman*, 899 F.Supp.2d 676, 708 (S.D. Ohio 2012), *aff'd sub nom., Sherfel v. Newson*, 768 F.3d 561 (6th Cir. 2014). Inasmuch as the Court has ruled that the medical opinions are not admissible, Plaintiffs are unable to establish a material issue of fact on the first element of this claim, and the claim must fail.

Claim II asserts civil assault and battery and/or wrongful death. (*Third Am. Comp.*, ECF No. 16, p. 5.) In Ohio, an assault is an unlawful offer or attempt, coupled with a present ability, to inflict an injury upon the person of another. *Woods v. Miamisburg City Schools*, 254 F.Supp.2d 868, 878 (S.D. Ohio 2003), citing *Daniel v. Maxwell*, 176 Ohio St. 207, 208 (Ohio 1964). Battery is defined as "an intentional contact with another that is harmful or offensive." *Gerber v. Veltri*, 702 Fed. App'x. 423, 433 (6th Cir. 2017) (citing *Love v. City of Port Clinton*, 37 Ohio St.3d 98, 99 (Ohio 1988). Defendant asserts that the claim is not yet ripe, because the County has not proceeded with the paving project. (*Def. Mot. S.J.*, ECF No. 117, p. 26.) However, an assault may be supported by an offer, and certainly the planned paving project could constitute an offer. Defendant notes that chip sealing the road is not of itself unlawful, and maintenance of the road is part of Defendant's duties, *see* Ohio Rev. Code § 5543.01(A). (*Id.*, p. 28.) However, Plaintiffs assert that the County is liable as a result of "wanton, reckless, and/or bad faith exercise of discretion" because Defendant "knows with substantial certainty that its actions will bring serious physical harm or death to Mrs. Majed." (*Third Am. Comp.*, ECF No. 16, ¶¶ 28-31.) Inasmuch as the Court has ruled that the proffered medical opinions are not admissible, the scienter requirement for this claim is unsupported, and the claim must fail.

Claim III seeks a declaratory judgment "to the effect that should the defendant proceed

with the threatened chip and seal project on the section of Dutch Creek Road extending from S.R. 550 to Stanley Road Mrs. Madej will suffer serious physical harm or death and that the Defendant will be liable for civil assault and battery and/or wrongful death." (*Third Am. Comp.*, ECF No. 16, ¶ 33.) Inasmuch as Claim II is unsupported, Claim III must also fail.

Claim IV asserts that Ms. Madej has been discriminated against in violation of the Fair Housing Amendments Act, 42 U.S.C. § 3601 *et seq.*, because of a failure to make a reasonable accommodation for her disability. (*Id.*, pp. 5-6.) Plaintiffs assert that there is a genuine issue of material fact as to the reasonableness of the accommodation sought by the Madejs. (*Pl. Mem. Opp.*, ECF No. 120, p. 28.) The "three operative elements" of the FHAA's reasonable accommodation requirement are "equal opportunity," "necessary," and "reasonable." *Smith & Lee Assocs., Inc. v. City of Taylor, Mich.*, 102 F.3d 781, 794 (6th Cir. 1996). The first two elements are closely related. The first asks "whether the requested accommodation would afford the disabled resident an equal opportunity to enjoy the property." *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 541 (6th Cir. 2014). The FHAA "links the term 'necessary' to the goal of equal opportunity. Plaintiffs must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice." *Smith & Lee Assocs.*, 102 F.3d at 795 (citations omitted). "The necessity element is, in other words, a causation inquiry that examines whether the requested accommodation or modification would redress injuries that otherwise would prevent a disabled resident from receiving the same enjoyment from the property as a non-disabled person would receive." *Hollis*, 760 F.3d at 541. There is simply no medical evidence to support the assertion that the

alternative proposed products would, in fact, provide such redress.[3] Inasmuch as the Court has ruled that the proffered medical opinions are not admissible, the claim must fail.

Claim V asserts that Ms. Madej will has been discriminated against under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, because of the County's failure to make a reasonable modification to accommodate her disability. (*Id.*, pp. 6-7.) The specific modification Plaintiffs seek is the use of an alternative product to chip seal on the portion of Dutch Creek Road at issue. Because there is no admissible medical evidence to support Plaintiffs' claims relative to chip seal, let alone to support the safety of the proposed alternatives, there is no issue of material fact, and summary judgment is appropriate. Accordingly, Defendant's motion for summary judgment is well-taken and is **GRANTED**.

Finally, the Court notes that Ms. Madej is quite ill, a fact that is undisputed. As a citizen, her health is important to officials serving Athens County. The Court encourages the County Engineer to give Ms. Majed notice far in advance of road work and to explore any remedial measures which could reduce environmental emissions near her home.

---

[3] To the contrary, the medical evidence indicated that no level of chemical exposure is safe for Ms. Madej, and none of the doctors could testify that the proposed alternative chemicals would be safe.

## IV.    CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment (*Def. Mot. S.J.*, ECF No. 117) is **GRANTED**.    The claims of Plaintiffs are **DISMISSED WITH PREJUDICE**, and the preliminary injunction is **VACATED**.


**IT IS SO ORDERED.**


_____10-12-2018_____

**DATE**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**